792 So.2d 33 (2001)
Benton JOHNSON
v.
FIRST NATIONAL BANK OF SHREVEPORT, et al.
No. 2000-870.
Court of Appeal of Louisiana, Third Circuit.
June 20, 2001.
Rehearing Denied September 12, 2001.
*40 Mr. Stephen O' Brien Scandurro, Mr. Dewey M. Scandurro, Scandurro & Layrisson, L.L.C., New Orleans, LA, Counsel for Benton Johnson, Appellee.
Mr. Bernard Slattery Johnson, Cook, Yancey, King & Galloway, Shreveport, LA, Counsel for Aetna Casualty & Surety Co., Appellant, Counsel for Standard Fire Insurance Company, Appellant.
Mr. Samuel Maurice Hicks, Jr., Lydia M. Rhodes, Hicks, Hubley & Marcotte, Shreveport, LA, Counsel for Fidelity & Guaranty Underwriters, Appellant.
Ms. Deborah Shea Baukman, Mayer, Smith & Roberts, Shreveport, LA, Counsel for Saint Paul Insurance Company, Appellant.
Mr. Harry D. Simmons, Bodenheimer, Jones, Klotz and Simmons, Shreveport, LA, Counsel for North Rivers Insurance Company, Appellee.
Mr. Ronald Everett Raney, Lunn, Irion, Johnson & Salley, Shreveport, LA, Counsel for Fidelity & Casualty Company, Appellant, Counsel for Phoenix Assurance Company, Appellant.
Mr. David B. Means, III, Plummer & Means, Mansfield, LA, Counsel for Mr. Dwight Young, Appellee, Counsel for Ms. Gloria Young, Appellee.
Ms. Mary Olive Pierson, Cooper & Pierson, Baton Rouge, LA, Counsel for Mr. Benton Johnson, Appellee, Counsel for Mr. Dwight Young, Appellee (in cons. case), Counsel for Ms. Gloria Young, Appellee (in cons. case).
Court composed of SYLVIA R. COOKS, JOHN D. SAUNDERS, and BILLIE COLOMBARO WOODARD, Judges.
SAUNDERS, Judge.
The trial court awarded Benton Johnson $784,000.00 in general damages. On appeal, *41 we reduce that award to $150,000.00, and we remand to the trial court for further proceedings consistent with this opinion.

FACTS
Jess Loyd worked for the First National Bank of Shreveport for more than 35 years. Of those years, he spent 20 as vice-president in charge of agricultural lending. Mr. Loyd developed a reputation both in and outside of the bank as a person who was held in high esteem by his co-workers, superiors, and the agricultural community in North Louisiana. Publicly, he was perceived to be highly knowledgeable in all matters regarding the cattle business, especially the financing of the cattle business. Mr. Loyd was viewed as a powerful and influential man. People in the community considered it an honor to be a customer of Mr. Loyd and First National Bank of Shreveport.
Privately, Mr. Loyd engaged in making false representations to the bank's customers. Mr. Loyd asserted that he had superior knowledge and expertise in cattle farming. Mr. Loyd represented to his customers that the bank required they follow his advice and direction in order to remain customers of the bank. He also engaged in extensive self-dealing at the expense of the bank's customers.
Gradually, Mr. Loyd began to direct and control the businesses of the bank customers. To achieve his personal goals, he developed extremely close and personal relationships of friendship and trust with these customers. Mr. Loyd developed such a relationship with Mr. Benton Johnson. Mr. Johnson considered Mr. Loyd to be "family." Mr. Johnson trusted Mr. Loyd, did not doubt his advice, and looked to him for his superior knowledge.
Mr. Loyd encouraged his customers, such as Mr. Johnson, to continue following his advice, even after losing years, by loaning more money to cover previous losses. After a loss, Mr. Johnson testified that Mr. Loyd would say, "Well, we'll do better next year. We'll double up and catch up, or we'll make it up down the road." After his customers became deeply indebted to the bank, it became apparent, even without Mr. Loyd saying so, that he was extremely powerful and was in a position to discontinue credit to his customers if they failed to follow his advice. Once heavily indebted, his customers did not have the option of changing banks. In October 1986, Mr. Loyd quietly retired, but remained with the bank as a contract consultant.
In April 1987, Mack James, a bank customer, confronted the bank with information he had learned about Mr. Loyd's misconduct. Although the bank did not acknowledge or believe the allegations, the bank contacted Mr. Loyd. A few days later, Mr. Loyd admitted that he had "profiteered" off of his customers and had committed various crimes. Mr. Loyd expressed concern that the bank would "send him up the river" for his conduct. Mr. Loyd made these admissions to a bank officer and one of his co-conspirators shortly before Loyd committed suicide.

PROCEDURAL FACTS
Mr. Johnson filed suit on April 18, 1988. Initially, Mr. Johnson brought his suit in Sabine Parish; however, the suit was later consolidated with the suit of Dwight Young, et al, which was pending in DeSoto Parish. On May 24, 1999, the jury trial of the matter began. On June 2, 1999, the jury returned a verdict in favor of Mr. Johnson on several theories of liability, including fraud, negligent supervision, breach of fiduciary duty, negligent misrepresentation, and general fault. The jury *42 assessed Mr. Johnson with 25% fault and awarded general damages of $588,000.00.
The trial judge made post-trial determinations regarding several coverage issues, including the issue of how Mr. Loyd's damages should be allocated. The trial judge heard arguments regarding these matters on November 5, 1999. The trial judge, on its own motion, increased the general damages awarded to Mr. Johnson to $784,000.00, finding that the jury had made an improper pre-verdict reduction of its award for Mr. Johnson's fault. The trial judge signed his judgment on December 3, 1999.
Mr. Johnson then filed a post-judgement motion for a new trial and a judgment notwithstanding the verdict (JNOV), which the court granted on February 16, 2000. The trial judge found that the reduction of Mr. Johnson's damages for his own fault was improper under the provisions of La. Civ.Code art. 2323(C) because of the jury's finding of fraud. The trial judge signed this judgment on March 7, 2000.
From this judgment, Fidelity & Casualty Company of New York, Phoenix Assurance Company of New York, Fidelity & Guaranty Underwriters, Inc., St. Paul, Aetna Casualty & Surety Company, and Standard Fire Insurance Company filed timely suspensive appeals. Prior to the hearing on this matter, Aetna Casualty & Surety Company and Standard Fire Insurance Company dismissed their appeals, having settled with Mr. Johnson regarding the portion of the judgment for which they were cast.

LAW AND ANALYSIS
On appeal, Defendant insurers assert numerous assignments of error. In order to handle the sheer volume of assignments, we will address the assignments in the following order: procedural errors, errors concerning the merits of the case, errors concerning jury instructions, evidentiary errors, errors concerning the damages awarded, and errors regarding insurance coverage.

I. PROCEDURAL ERRORS
The Defendants assert the following procedural errors:
1. The trial judge erred in consolidating this matter for trial in an improper venue with another matter involving more inflammatory evidence to the prejudice of the Defendants.
2. The trial judge erred in allowing Mr. Johnson to bring two suits, one for economic damage and one for bodily injury.

Consolidation
On appeal, the Defendants allege that the trial judge erred in consolidating this matter for trial in an improper venue with another matter involving more inflammatory evidence to the prejudice of the Defendants. In support of this argument, the Defendants argue that the consolidation of Mr. Johnson's case with that of the Youngs', pending in DeSoto Parish, violated the provisions of La.Code Civ.P. art. 123(A), which states:
For the convenience of the parties and the witnesses, in the interest of justice, a district court upon contradictory motion, or upon the court's own motion after contradictory hearing, may transfer a civil case to another district court where it might have been brought; however, no suit brought in the parish in which the plaintiff is domiciled, and in a court which is otherwise a court of competent jurisdiction and proper venue, shall be transferred to any other court pursuant to this Article.
The Defendants also argue that such a consolidation was improper under La.Code Civ.P. art. 1561(B) because it gave an undue *43 advantage to Mr. Johnson. The Defendants assert that Mr. Johnson's claim was not as emotionally charged and inflammatory as the Youngs' because of the lack of any evidence of kickbacks affecting Mr. Johnson's profit line and the lack of any evidence of medical or psychological treatment when compared to that of the Youngs' who adduced the medical testimony of Drs. Seiden and Taylor. In making this argument, they look to La.Code Civ.P. art. 1561(B), which provides:
Consolidation shall not be ordered if it would do any of the following:
(1) Cause jury confusion.
(2) Prevent a fair and impartial trial.
(3) Give one party an undue advantage.
(4) Prejudice the rights of any party.
Upon a review of the record, we find that the consolidation of the two matters was appropriate. Cases may be consolidated when they are pending in the same court. See La.Code Civ.P. art. 123. The Parishes of DeSoto and Sabine compose the Eleventh Judicial District Court. La.R.S. 13:477(11). Each judicial district constitutes a single court. The creation of different divisions within that court does not operate to sever a single district court into multiple courts. Piper v. Olinde Hardware & Supply Co., 288 So.2d 626 (La.1974). The reference to court in the consolidation article is synonymous with judicial district court in cases dealing with procedural issues. See Robertson v. Cambon, 146 So. 738, 176 La. 753 (1933). Therefore, the trial court did not err in trying the Johnson and Young cases together in the same court; i.e., the Eleventh Judicial District Court.
In addition, we find the Defendants, second argument on this error equally without merit. Cases may be consolidated after a contradictory hearing when a trial court finds that common issues of fact and law predominate. See La.Code Civ.P. art. 1561(A). Here, both suits arose out of similar factual situations. Both suits involved the actions taken by Mr. Loyd on behalf of the bank. Both suits involved Mr. Loyd's interference with the Plaintiffs' cattle operations through his influence and control as the bank's agricultural loan officer. Consolidation of these matters promoted efficiency and judicial expediency. Judicial economy dictates that such similar matters arising out of the same set of facts and circumstances and against the same set of Defendants be tried together. Accordingly, we find the Defendants argument that the consolidation unfairly prejudiced them without merit.

Separate Suits
The Defendants also assert that Mr. Johnson did not have the right to file separate suits regarding the issues of economic damages and bodily injury. We disagree. The narrow scope of res judicata before 1991 allowed suits to be filed against different insurers and parties on separate obligations. See Greer v. State, 616 So.2d 811 (La.App. 2 Cir.1993); See, e.g., Cantrelle Fence and Supply Co., Inc. v. Allstate Ins. Co., 515 So.2d 1074, 1078 (La.1987) (held that a "single tort may give rise to multiple obligations" which could be brought in different suits); Mitchell v. Bertolla, 340 So.2d 287 (La.1976) (held that a single cause of action could be pursued in separate, successive lawsuits because suit could be brought on each theory of recovery). Accordingly, we find that the trial court did not err in allowing these matters to proceed in separate suits, and we find this assignment of error without merit.

II. MERITS OF THE CASE
The Defendants assert the following assignments of error regarding the merits of the case:

*44 1. The trial judge erred in granting a directed verdict finding Mr. Loyd to have been in the scope of his employment with the bank when he directed Mr. Johnson's decision-making in connection with his cattle operation.
2. The trial judge erred in finding that Mr. Johnson carried his burden of proving that the failure of his cattle business to profit and attendant mental anguish was more probably than not related to the involvement of Mr. Loyd in his cattle operation rather than prevailing bad market conditions.
3. The trial judge erred in finding that either Mr. Loyd or the bank committed acts of fraud which were the legal cause of Mr. Johnson's damages based upon a lack of any evidence that any acts of fraud committed by those parties were made in connection with Mr. Johnson's banking business or banking transactions.
4. The trial judge erred in finding Mr. Johnson to be entitled to recover under a theory of breach of fiduciary duty.
5. The trial judge erred in finding that Mr. Johnson proved negligence, by showing negligent misrepresentation and negligent supervision on the part of Mr. Loyd or the bank.
6. The trial judge erred in overruling the Defendants' peremptory exception of no cause of action for mental anguish damages in the absence of contemporaneous physical injury.

Course and Scope
In this assignment of error, the Defendants assert that the trial judge erred in granting a directed verdict, which found Mr. Loyd to have been in the scope of his employment with the bank when he directed Mr. Johnson's decision-making in connection with his cattle operation. In response to this assignment, Mr. Johnson argues that the trial judge's directed verdict regarding whether Mr. Loyd was in the course and scope of his employment was proper. Mr. Johnson asserts that a directed verdict is proper when there is no dispute as to any material fact. See Leflore v. Coburn, 95-249, 95-690 (La.App. 4 Cir. 12/28/95); 665 So.2d 1323, writ denied, 96-411 (La.3/29/96); 670 So.2d 1234. Mr. Johnson argues that while many facts show that Mr. Loyd was in the course and scope of his employment with the bank, the issue can be resolved based on the determinative fact that Mr. Loyd's acts as an executive were a financial benefit to the bank.
In support of this argument, Mr. Johnson points to the testimony of Dr. Staats, the Defendants' banking expert. Dr. Staats testified that the bank derived a direct benefit from Mr. Loyd's conduct toward Mr. Johnson. Dr. Staats testified that the hedging transactions forced upon the cattle ranchers were for the benefit of the bank. Dr. Staats admitted that the bank received interest revenue from Mr. Johnson through loans generated by Mr. Loyd in the amount of $187,555.00, not to mention other fees, charges, and loans to other customers.
The scope of risk is greatly expanded for executive level employees, and liability will generally be imposed where the employee was "at least partially motivated by an intent to serve the interests of the business." Ermert v. Hartford Ins. Co., 559 So.2d 467, 477 (La.1990). Ermert involved an executive who accidentally shot a companion at a hunting camp. Id. The Louisiana Supreme Court reasoned that the executive used the camp to further his employer's business, such that the accidental shooting was fairly attributable to the employer. Id. The supreme court stated:

*45 Specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or of a third person. The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. So also, the act may be found to be in the service if not only the manner of acting but the act itself is done largely for the servant's purposes.
(Citations omitted.) Id. at 476-477. The employer does not need to actually receive any benefit from the employee's act, but if the employer does derive any benefit from the activities of the employee, that is the decisive factor. Id.
In the instant case, Mr. Loyd's collection of interest and fees as well as his actions in forcing Mr. Johnson to engage in hedging transactions were solely for the benefit of the bank. These transactions provided no benefit to Mr. Loyd. Thus, Mr. Loyd was not completely motivated by his own self-interest in his dealings with Mr. Johnson and was acting, at least in part, for the bank's benefit. Accordingly, we find that the trial judge did not err in issuing a directed verdict finding that Mr. Loyd was in the course and scope of his employment with the bank at the time he directed Mr. Johnson's business making decisions.

Burden of Proof
The Defendants assert that the trial judge erred in finding that Mr. Johnson carried his burden of proving that the failure of his cattle business to profit and his attendant mental anguish were more probably than not related to the involvement of Mr. Loyd in his cattle operation rather than prevailing bad market conditions.
This court will not set aside a trial judge's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Stobart v. State, Through D.O.T.D., 617 So.2d 880, 882 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. 1989). In order for this court to find that the factfinder's determination warrants reversal, we must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, 617 So.2d 880; Mart v. Hill, 505 So.2d 1120 (La.1987). Therefore, this court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Stobart, 617 So.2d 880; Mart, 505 So.2d 1120. This court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. Our court may not reverse, even if convinced that if it had been sitting as the trier of fact, we would have weighed the evidence differently, if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).
A review of the record indicates that Mr. Johnson's relationship with Mr. Loyd was a long one. Mr. Johnson met Mr. Loyd through 4-H when Mr. Johnson was 11 years old. Having grown up in a family and an area dedicated to cattle farming, Mr. Johnson's life-long ambition was to become a cattle farmer. Mr. Johnson began his career in the dairy business, and then later went into the cow/calf business. The cow/calf business is a traditional method of Louisiana cattle ranching. Simply stated, the cow/calf business involves having a herd of cows and bulls and breeding them from year to year. At the end of *46 each year, the calves are sold and the cows and bulls are bred again to produce another calf crop.
Upon the suggestion of Mr. Loyd, Mr. Johnson changed his cattle farming operation from predominately cow/calf to a rye grass operation. A rye grass operation involves buying young cattle in the fall, fattening them on grass through the winter, and selling them in the spring and summer. Mr. Johnson testified that he switched his cattle operation from cow/calf to rye grass because "Mr. Jess thought it would be a better thing to do."
When Mr. Johnson's father died, he inherited 95 acres of land, which were free of any debt. Within one week of acquisition, Mr. Loyd convinced him that he should put a mortgage on the land in favor of the bank as additional collateral for existing loans.
Later, in 1977, Phillips Petroleum was drilling a deep well and wanted to buy Mr. Johnson's royalty interest. Since the bank had a mortgage on the land, Mr. Johnson called Mr. Loyd. Mr. Loyd told Mr. Johnson, "We don't want to sell no royalty." Because of Mr. Loyd's perceived power, Mr. Johnson's trust in Mr. Loyd, and Mr. Johnson's belief that he must follow Mr. Loyd's advice as the bank representative, Mr. Johnson did not pursue further negotiations with Phillips Petroleum. Mr. Johnson lost an opportunity to collect nearly $400,000.00 because he did not pursue the sale.
In 1978, Mr. Loyd called Mr. Johnson to contract his cattle at a unit price of forty-three and one-half cents, allegedly to be bought by Mr. Chuck Heldridge, although Mr. Loyd was the only person who handled the transaction. Mr. Johnson never met Mr. Heldridge. Mr. Loyd prepared the papers for the bank. After signing the contract with Mr. Heldridge, the unit price of cattle went from forty-three cents to sixty-three and one-half cents at the time of sale. When the price rose to the mid-fifties, Mr. Johnson received a strange phone call from Mr. Loyd, who had been told by a person he could not identify that Mr. Johnson was not going to deliver the cattle due under the contract because cattle prices were rising. This phone call shows that Mr. Loyd was more interested in the contract than he was in Mr. Johnson making a profit. Mr. Heldridge was never seen, and since Mr. Loyd seemed more interested in selling the cattle at the low contract price rather than helping Mr. Johnson make a profit, the jury could infer that the cattle were contracted, not to Mr. Heldridge at all, but to Mr. Loyd. This inference is supported by the testimony of Cat Wade, Mr. Loyd's partner, who testified that Mr. Loyd on several occasions over the years, would tell bank customers that they were buying cattle from certain individuals, when in truth, they were buying cattle that belonged to Mr. Loyd or Mr. Wade. As a result, Mr. Johnson lost $20.00 per hundred weight on that transaction.
In 1982, at the direction of Mr. Loyd, Mr. Johnson engaged in hedging his cattle and lost money. Mr. Loyd selected the brokerage house, and he selected the stockbroker. Mr. Johnson never met the stockbroker, and he did not make the timing decisions regarding when to hedge. Mr. Loyd directed, handled, and controlled all aspects of that transaction. Mr. Johnson testified that he knew nothing about hedging.
In 1976, Mr. Johnson testified that Mr. Loyd persuaded him to send his cattle to feedlots, sometimes two thousand miles away from home rather than selling cattle out of his pastures. Mr. Johnson, at the direction of Mr. Loyd did this for several years. Then in 1984, Mr. Johnson testified that he sent calves to the feedlot in *47 McLave, Colorado, which had been selected by Mr. Loyd. When he asked Mr. Loyd why they were sending the cattle that far away, Mr. Loyd's only response was that the lot was going to feed the cattle corn instead of milo. The record, however, supports another explanation. Mr. Loyd confessed to Mr. James Hugh Watson, the bank president, that he had cattle in the same feedlot at the same time as Mr. Johnson and that the feedlot forgave his feed bill of $18,000.00. A reasonable inference is that the feedlot forgave Mr. Loyd's feed bill, and spread the costs to the bank's customers who owned cattle in the same lot. While it can be inferred that this transaction greatly benefitted Mr. Loyd, Mr. Johnson received a poor return on his investment.
Finally, Mr. Watson and Dr. Staats, the Defendants' banking expert, each testified that transaction was inappropriate. Dr. Staats testified that the transaction was unethical and a violation the bank's policy. Dr. Staats elaborated, stating that the reason why this was considered unethical was that the transaction made it easy to commingle the cattle or charge the officers' feed bill to the customers.
In 1983, on the one occasion Mr. Johnson attempted to sell his cattle without Mr. Loyd's prior approval; Mr. Loyd severely reprimanded him. Mr. Johnson's proposed business deal was with Swift and Henry, one of the largest order buyers in the United States. Even so, Mr. Loyd went to Mr. Johnson's place of business, and reprimanded him in front of several people. Mr. Johnson testified that Mr. Loyd made him feel like "a bank robber" for making a deal without him.
Finally, the totality of Mr. Loyd's control over Mr. Johnson's cattle operations can be seen in the following dialog at trial:
Q: Mr. Johnson, who made the decision in your cattle operations, the management decisions in your cattle operation about when to sell cattle and when to buy cattle?
A: Mr. Jess.
Q: Who made the managerial decision about feedlots?
A: Mr. Jess.
Q: Who made the decisions about hedging?
A: Mr. Jess.
After a review of the record, we can not say that the trial court was manifestly erroneous in its conclusion that Mr. Johnson met his burden of proof. Based on the testimony cited herein and present in the record as a whole, it is clear that Mr. Loyd manipulated Mr. Johnson through his position of power, respect, trust, and confidence at the bank. This manipulation caused Mr. Johnson to make decisions based on Mr. Loyd's wishes, and ultimately caused his cattle business to fail. Accordingly, we find the trial judge did not err in finding that Mr. Loyd carried his burden of proving that the failure of his cattle business and his mental anguish were linked to Mr. Loyd's involvement in his cattle operation.

Fraud
The Defendants also assert that the trial court erred in finding that either Mr. Loyd or the bank committed acts of fraud which were the legal cause of Mr. Johnson's damages. In support of this argument, the Defendants assert that there was no evidence that Mr. Loyd "skimmed the cream" off of Mr. Johnson's profits from his cattle business. The Defendants further assert that the testimony of Cat Wade and McCauley M. James, Sr., which indicated that Mr. Loyd and Mr. Wade were splitting commissions on the purchase of cattle for some of the bank's customers, should not be used to prove that Mr. Loyd defrauded Mr. Johnson. *48 The Defendants assert that the evidence established that Mr. Johnson's cattle were not purchased by Mr. Wade; therefore, the Defendants argue that this fraudulent scheme did not affect the profitability of Mr. Johnson's cattle business.
Mr. Johnson, on the other hand, argues that the facts established at trial show that Mr. Loyd committed fraud in his dealings with him. Mr. Johnson asserts that Mr. Loyd pronounced himself an expert in all aspects of cattle operations, when in fact, he was not. This false representation, in conjunction with Mr. Johnson's first hand knowledge that "you didn't buck with Mr. Jess," enabled Mr. Loyd to take control of Mr. Johnson's business, leading to Mr. Johnson's damages.
In addition, Mr. Johnson established at trial that Mr. Loyd had a personal feed bill of $18,000.00 written off by the feed lot to which Mr. Loyd insisted that Mr. Johnson and the other cattlemen send their cattle. Mr. Johnson argues that the jury could have related this large, direct financial benefit to Mr. Loyd because Mr. Loyd steered the cattlemen to that particular feedlot. As Mr. Loyd did not disclose this benefit to any of the cattlemen, Mr. Johnson argues that this could be taken as fraud through silence. In addition, Mr. Updegraff testified that these feedlot arrangements allowed Mr. Loyd to self-profit. Mr. Updegraff testified that the bank could not refute the fact that Mr. Loyd profited through fraud or artifice. In sum, Mr. Johnson argues that the jury had multiple justifications for finding that Mr. Loyd committed fraud.
Fraud is defined in La.Civ.Code art.1953 as:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
Fraud may be established by circumstantial evidence. See La.Civ.Code art. 1957. A plaintiff's burden of proof in establishing fraud is merely a preponderance of the evidence. See Id. "Courts have always acknowledged how difficult it is for one to prove fraud by positive and direct testimony, realizing full well that those who indulge in it generally prepare themselves in such a manner as to cover up and leave no traces of their practice behind them." Griffing v. Atkins, 1 So.2d 445, 450 (La. App. 1 Cir.1941); see La.Civ.Code art. 1957 revision comments (b).
After a review of the record, we find that the trial judge did not err in finding that Mr. Loyd committed acts of fraud which caused Mr. Johnson damage. On the whole, the evidence preponderates in favor of the trial judge's finding that Mr. Loyd defrauded Mr. Johnson. Accordingly, we find this assignment of error without merit.

Breach of Fiduciary Duty
The Defendants also argue that the trial judge erred in finding that Mr. Johnson was entitled to recover under a theory of breach of fiduciary duty. In support of this argument, the Defendants assert that under Louisiana law, no fiduciary relationship existed between Mr. Johnson and the bank. The Defendants cite La.R.S. 6:1124, which states in pertinent part:
No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act *49 and perform in the capacity of a fiduciary.
The Defendants assert that this statute should be applied retroactively, citing Guidry v. Bank of LaPlace, 94-1758 (La.App. 4 Cir. 9/15/95); 661 So.2d 1052, writ denied, 95-2477 (La.1/5/96); 666 So.2d 296, writ denied, 95-2490 (La.1/5/96); 666 So.2d 295, writ denied, 95-2498 (La.1/5/96); 666 So.2d 295.
In Guidry, the fourth circuit found that the trial court should have instructed the jury to consider the provisions of La.R.S. 6:1124. Id. The fourth circuit reasoned that the legislative intent of the act was "clarifying in nature" and applicable "to prior and now existing relationships and transactions involving financial institutions." Id. at 1055. Therefore, the fourth circuit held that La.R.S. 6:1124, which requires a written agency or trust agreement to impose on bank fiduciary responsibilities for customers or third parties, was an interpretative statute and could be applied retroactively where its application would not disturb vested or contractual rights between payee and banks. Id. Crucial to the fourth circuit's determination was the fact that no vested or contractual rights would be disturbed between the parties by the retroactive application of the statute. Id.
This court has recognized that La.R.S. 6:1124 should not be applied retroactively where the rights between the parties vested prior to the enactment of the statute. See Bryant v. Heritage Life Ins. Co., 613 So.2d 1044 (La.App. 3 Cir.1993). In the instant case, all actions between Mr. Loyd and Mr. Johnson giving rise to fiduciary duties on the part of Mr. Loyd occurred before the effective date of La.R.S. 6:1124. Furthermore, Mr. Johnson's claim for breach of fiduciary duty was filed before the enactment of that statute in 1991. Therefore, Mr. Johnson's rights were vested prior to the lower court's determination, and this court will not apply La.R.S. 6:1124 in the instant case. Accordingly, we find this assignment of error without merit.

Negligence
Defendants further argue that Mr. Johnson did not prove negligence, whether by negligent misrepresentation or negligent supervision on the part of Mr. Loyd or the bank. In support of their argument regarding negligent misrepresentation, the Defendants ask us to consider these points: 1. Since other financial institutions became insolvent about the same time, it is clear that Mr. Loyd was not the only person who made decisions which resulted in losses; and 2. Mr. Johnson adduced no expert testimony at trial showing that Mr. Loyd or the bank made any negligent decisions.
In order to prove negligent representation, a plaintiff must show a legal duty on the part of the defendant to supply correct information, a breach of that duty, and causation. Pastor v. Lafayette Bldg. Ass'n, 567 So.2d 793 (La.App. 3 Cir.1990). After a review of the record, we do not find that the trial court erred in finding that Mr. Loyd made misrepresentations of material fact to Mr. Johnson. Mr. Loyd convinced Mr. Johnson and others in his community that he was an excellent cattleman and cattle broker. More importantly, Mr. Loyd convinced Mr. Johnson and others that his demands and requirements were those of the bank. Mr. Loyd represented to Mr. Johnson that the bank required him to do business only as Mr. Loyd directed. Mr. Loyd made representations to Mr. Johnson that the bank would not finance cow/calf operations but would finance rye grass operations. Mr. Johnson represented that only an approved broker could buy and sell cattle, that the bank should specify the time to *50 sell and the quantity of cattle to sell at a given time, that hedging was required, and that only certain feedlots were approved.
The trial judge found that Mr. Loyd breached his duty to Mr. Johnson and that he suffered damages as a result. In a negligence action, a trial judge's findings of fact are subject to manifest error standard of review. Blunck v. Lloyds Underwriters at London, 93-1269 (La.App. 3 Cir. 5/4/94); 640 So.2d 466, writ denied, 94-1441 (La.9/23/94); 642 So.2d 1290. After a review of the record, we find that the trial judge did not err in finding that Mr. Loyd made negligent representations. Accordingly, we find this argument without merit.
The Defendants further argue that the evidence at trial did not support a finding that the bank failed to supervise Mr. Loyd. The Defendants assert that there was a "total lack of evidence" to support a finding that the bank had negligently supervised Mr. Loyd. The Defendants argue that "even assuming Loyd was engaged in inappropriate conduct, there was no way to discern such from the bank's records ..." In addition, the Defendants point to the testimony of Mr. Michael J. Woody, Mr. Johnson's expert, in which he stated that Mr. Loyd's purported conduct was by its nature covert.
In a negligence action, we may not reverse a trial court's findings of fact absent manifest error. Blunck, 640 So.2d 466. Although the Defendants argue that there was a "total lack of evidence" in the record to support a finding of negligent supervision, our review of the record shows ample evidence to support such a finding. It is evident from the facts before us that the bank did not make pains to supervise Mr. Loyd, giving him free rein to conduct matters concerning agricultural loans as he saw fit. Accordingly, after a review of the record, we find that the trial court did not err in finding that the bank was negligent in its supervision of Mr. Loyd.

Mental Anguish
In this assignment, the Defendants argue that the trial judge erred in overruling their peremptory exception of no cause of action for mental anguish damages in the absence of contemporaneous physical injury. In support of this argument, the Defendants cite Moresi v. State Through Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990) and Dumas v. Angus Chem. Co., 31-400 (La.App. 2 Cir. 1/11/99); 728 So.2d 441, writ denied, 99-397 (La.4/9/99); 740 So.2d 631, writ denied, 99-751 (La.4/30/99); 741 So.2d 19. As a general rule if a defendant's conduct is merely negligent and causes only mental disturbance, absent accompanying physical injury, then the defendant is not liable for that emotional disturbance. See Moresi, 567 So.2d 1081; PROSSER & KEETON § 54 at p. 361; RESTATEMENT OF TORTS (2d) § 436A. Commonly, the courts award damages for emotional distress to victims who have suffered contemporaneous personal injury. Dumas, 728 So.2d 441. Here, the Defendants' argument is flawed for two reasons. First, contemporaneous physical injury is not always required for mental anguish damages. Second, the record clearly shows that Mr. Johnson suffered contemporaneous physical injury.
The Defendants underestimate the breath of claims that may merit mental anguish awards. A well known tort treatise outlines the types of cases in which the Louisiana courts have allowed mental anguish awards stating:
Mental distress that accompanies prior or contemporaneous physical injury is compensable; it sometimes is called "parasitic," and as such is an element of damages caused by the physical injury. *51 Mental anguish occasioned by damage to property also is compensable if the mental anguish victim was present or nearby and suffered psychic trauma as a direct result of watching the destruction of his or her property.... Although the plaintiff does not suffer contemporaneous personal injury or property damage, he or she nevertheless may recover for negligently inflicted emotional distress if the defendant's conduct placed the plaintiff in fear or concern for his or her safety....[In] Louisiana ... an award is proper when the conduct is directed at the mental anguish victim and the circumstances show an "especial likelihood of genuine and serious mental distress." Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common. Other situations where emotional distress may be recoverable were cataloged by the Louisiana Supreme Court in Moresi v. State: (1) a telegraph company negligently transmitting a message, especially one announcing death; (2) mishandling of corpses; (3) failure to install, maintain or repair consumer products and (4) failure to take photographs or develop film.
FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 5-8 at p. 124-125 (1996).
While we note that physical injury or manifestation of serious mental distress need not be proven in cases in which there is an "especial likelihood of genuine and serious mental distress, arising from special circumstances," that special rule need not be applied here. Moresi, 567 So.2d at 1096. In the instant case, evidence adduced at trial shows that as a result of Mr. Loyd's activities, Mr. Johnson suffered from hypertension and endured treatments for this illness. Mr. Johnson also suffered from sleeplessness because of the problems that his relationship with Mr. Loyd caused him to develop. As a result of his business failure attributable to Mr. Loyd, Mr. Johnson testified that he lost his self-confidence and his feelings of self-worth. Mr. Johnson also testified that he became humiliated and lost his good reputation in the community.
At trial, Mr. Johnson's testimony regarding his hypertension and mental anguish was uncontradicted. Where testimony is uncontradicted, and there is no reason to doubt a witness' testimony, such testimony should be accepted by the trier of fact. Johnson v. Insurance Co. of N. America, 454 So.2d 1113 (La.1984); Aycock v. City of Shreveport, 535 So.2d 1006 (La.App. 2 Cir.1988), writ denied, 536 So.2d 1223 (La.1989). A plaintiff need not offer expert evidence to show a "reasonable medical certainty"in order to prove causation. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). Accordingly, we do not find that the trial judge erred in finding that Mr. Johnson's case warranted an award of mental anguish damages. Therefore, we find this assignment of error without merit.

III. JURY INSTRUCTIONS
The Defendants made the following assignments of error regarding jury instructions:
1. The trial judge erred in failing to instruct the jury that circumstantial evidence must exclude other reasonable hypotheses or causes with a fair amount of certainty, so that it would be more probable than not that the harm was caused by the tortious conduct of the Defendants.
2. The trial judge erred in cumulating the liability and legal causation inquiries on the jury verdict form.
3. The trial judge erred in failing to include an inquiry relating to the Defendants' *52 affirmative defenses based upon the doctrines of mitigation and avoidable consequences on the jury verdict form.

Circumstantial Evidence
In this assignment, the Defendants urge that the trial court erred in failing to instruct the jury that circumstantial evidence must exclude other reasonable hypotheses or causes with a fair amount of certainty, so that it would be more probable than not that the harm was caused by the tortious conduct of the Defendants. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; however, he must correctly charge jury. Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3 Cir.1989). Adequate jury instructions are those which fairly and reasonably point to the issues and to the principles of law for the jury to apply to those issues. Lee v. Automotive Cas. Ins. Co., 96-517 (La.App. 3 Cir. 11/6/96); 682 So.2d 995, writ denied, 96-2949 (La.1/31/97); 687 So.2d 409. Our court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Id., Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir. 1991). Under the manifest error standard of review, we will not reverse unless the jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Lewis, 546 So.2d 267.
At trial, the following instruction regarding circumstantial evidence was given:
The first thing that you should know about the law is that the Plaintiffs in these actions must prove their cases by a preponderance of the evidence. This means that the Plaintiffs must convince you that, when the evidence is taken as a whole, the facts or causes sought to be proved are more probable than not. If they fail to prove or establish any essential element of their cases by a preponderance of the evidence, then you must find that they have failed to prove their cases sufficiently to recover.
. . . .
A fact must be proven either by direct evidence or circumstantial evidence, or perhaps both. Direct evidence is testimony by witnesses as to what they saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you may infer that another fact is true.
. . . .
The Plaintiffs have the burden of proving each part of their claim by a preponderance of the evidence. That means evidence which, considered in light of all the facts, leads you to believe that the claim is more likely true than not.
Upon reviewing this particular portion of the jury instructions as well as the jury instructions as a whole, we find the jury instructions to be adequate. Although the Defendants did not receive the benefit of the jury instructions they requested, they did receive the benefit of jury instructions which correctly stated the law. Accordingly, we find that the trial judge did not err in failing to use the Defendants requested jury instructions.

Cumulation of Liability and Legal Causation Inquiries
In their next assignment of error, the Defendants argue that the trial judge erred in cumulating the liability and legal causation issues on the jury verdict form. In support of this argument, they assert that cumulating the inquiries relating to fault and causation is inconsistent with the permit of La.Code Civ.P. art. 1812. Article 1812(C) provides:

*53 In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, nonparty means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.
We will not set aside a trial judge's determination whether to submit special interrogatories to the jury or its framing of questions to be posed to the jury, absent an abuse of discretion. See Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574 (La.App. 3 Cir. 2/19/97); 690 So.2d 154, writ denied, 97-1223 (La.9/19/97); 701 So.2d 169, writ denied, 97-1245 (La.9/19/97); 701 So.2d 170. The trial judge has broad discretion in determining whether to submit special interrogatories to the jury and has wide discretion in framing questions to be posed to the jury. Id.; Black v. Prudential Prop. & Cas. Ins. Co., 93-878 (La.App. 3 Cir. 3/2/94); 634 So.2d 1340. Defendants cite Smith v. Lincoln Gen. Hosp., 27,133 (La. App. 2 Cir. 6/21/95); 658 So.2d 256, writ denied, 95-1808 (La.10/27/95); 662 So.2d 3, for the proposition that cumulating inquiries regarding fault and legal causation is inconsistent with La.Code Civ.P. art. 1812. However, in that instance, the court actually held that a cumulation of the issues before it to be proper. Id. In doing so, the court noted that "[w]hile it might be the better practice to submit a separate interrogatory on each theory supporting a cause of action, the matter is within the trial court's broad discretion." Id. at 262.
In the instant case, the interrogatory read as follows:
INTERROGATORY NUMBER 6: Do you find that The First National Bank of Shreveport or Jess Loyd were at fault and, if so, was such fault a legal cause of damage?
YES X NO
As in Smith, we find that while it might have been better practice to submit a separate interrogatory regarding fault and legal *54 causation, this decision falls within the broad discretion of the trial court. See Id. We find that the trial court did not abuse its broad discretion in submitting this interrogatory to the jury. Accordingly, we find this assignment of error without merit.

Affirmative Defenses
In its next assignment of error, St. Paul urges that the trial court erred in failing to include on the jury verdict form an inquiry relating to the affirmative defenses of mitigation and avoidable consequences. Mr. Johnson, on the other hand, argues that the trial court was correct to instruct the jury on mitigation of damages without giving the jury special interrogatories as to whether Mr. Johnson failed to mitigate his damages or suffered "avoidable consequences." Mr. Johnson argues that the trial court adequately charged the jury on mitigation of damages. Mr. Johnson points to the jury charge in which the trial judge stated that the jury "must reject the claims for additional damages" if it found Mr. Johnson suffered from "avoidable consequences."
As stated earlier, we will not set aside a trial court's determination whether to submit special interrogatories to the jury absent an abuse of discretion. Citgo, 701 So.2d 169. At trial, the judge gave the jury the following instructions:
Plaintiffs are obligated to exercise reasonable diligence and ordinary care in order to minimize their damages after the initial injury has been inflicted. The doctrine of mitigation of damages imposes a duty upon an injured person to make reasonable efforts to minimize his damages. Failure to take reasonable steps to minimize damages will reduce a plaintiffs recovery. Reasonable efforts require no more than what is called for by common sense, good faith and fair dealing.
Plaintiffs' claims for damages must be measured by the principle of avoidable consequences. If after finding that the Plaintiffs sustained initial damages, you find that the Plaintiffs wouldcould have reasonably avoided sustaining further damages by taking reasonable steps, you must reject the claims for additional damages.
The trial court has broad discretion in determining whether to submit special interrogatories to the jury. Id.; Black, 634 So.2d 1340. A trial court's refusal to give a requested special charge is not error when the charge, in effect, is included within general charges, Segura v. State Farm Ins. Co., 94-1428 (La.App. 3 Cir. 5/31/95); 657 So.2d 1047. Here, the general charges given by the judge covered the special interrogatories which St. Paul had requested. Although the trial judge did not give special interrogatories regarding the affirmative defenses, he is given broad discretion in making such determinations. Because the affirmative defenses were included in the general instructions to the jury, we find that the trial judge did not abuse his discretion in failing to incorporate special interrogatories regarding the affirmative defenses. Accordingly, we find this assignment of error without merit.

EVIDENCE
The Defendants assert the following assignment of errors regarding evidence:
1. The trial court erred in allowing Mr. Johnson to cross-examine Don Updegraff regarding an affidavit concerning the meaning of the legal term "course and scope of employment" contained in his affidavit and in overruling the Defendants' objections to the affidavit's use as highly inflammatory and calling for a legal conclusion.

*55 2. The trial court erred in refusing to allow the Defendants to introduce the affidavit of Don Updegraff and the proof of loss once reference was made to it by Defendant.
3. The trial court erred in barring the Defendants from cross-examining Pam Young King regarding a sworn detailed descriptive list in which she testified that the value of Gloria Young's claim against the Defendants was worth only $500.00 as per the instructions of her lawyer for tax purposes.
In these assignments, we are asked to review the evidentiary rulings of the trial court. La.Code Evid. art. 103(A) provides that error may not be predicated on a ruling admitting evidence unless a substantial right of the party is affected. In reviewing the evidentiary decisions of a trial court, this court must consider whether the particular ruling complained of was erroneous, and if so, whether the error prejudiced the complainant's case. Morrison v. Kappa Alpha PSI Fraternity, 31,805 (La.App. 2 Cir. 5/7/99); 738 So.2d 1105. Reversal is not warranted unless the error prejudiced the complainant's case. Id.

Updegraff Affidavit
The Defendants argue that the trial court erred in allowing Mr. Johnson to cross-examine Don Updegraff regarding an affidavit he made in prior litigation concerning the meaning of the legal term "course and scope." Mr. Updegraff is a former president of First National Bank. At trial he was questioned, over Defendants' objections, as to information contained in his affidavit regarding whether Mr. Loyd was in the course and scope of his employment when he became involved in directing Mr. Johnson's business decisions regarding his cattle. The affidavit verified a proof of loss submitted in a related fidelity bond proceeding. The Defendants point to La.Code Evid. art. 602, which states:
A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This Article is subject to the provisions of Article 703, relating to opinion testimony by expert witnesses.
The Defendants then point to the following testimony by Mr. Updegraff:
Q. Did you know that Mr. Loyd, in dealing with the customers of the bank, ever made management decisions for them?
A. No, ma'am, I didn't.
The Defendants also point to Mr. Updegraff s testimony which indicates that he did not know of the kickback scheme between Mr. Loyd and Mr. Wade until some time after Mr. Loyd's death.
In response to this argument, Mr. Johnson asserts that the Mr. Updegraff's affidavit was used for impeachment purposes. At trial, Mr. Updegraff refused to acknowledge the truth of his prior sworn statement in related litigation. Mr. Updegraff s testimony contradicted his prior affidavit he had signed in 1988 as president of, and on behalf of, the bank. Accordingly, Mr. Johnson asserts that he used the affidavit for impeachment purposes. The use of a prior inconsistent statement under such circumstances is proper.
In considering this matter, the trial court stated:
The bank benefitted from interest payments by these Jess Loyd customers totaling $784,000. Further, the bank collected on its own directors and officers surety bond for Jess Loyd's actions, and therein the Bank, through its president, *56 attested to the fact that Jess Loyd was acting in the course and scope of his employment. This Court's prior directed verdict ruling that Jess Loyd was acting in the course and scope of his employment is affirmed.
Here, the evidence of record clearly shows that Mr. Loyd was in the course and scope of his employment at the time he took the actions at the root of this lawsuit. The affidavit was not admitted into evidence, and was used only by Mr. Johnson for impeachment purposes. Accordingly, the Defendants were not prejudiced by Mr. Johnson's limited use of the affidavit. Therefore, we find that the trial court did not err in allowing Mr. Johnson to cross-examine Mr. Updegraff regarding his prior inconsistent statements contained in his affidavit.

Introduction of Affidavit
In a related assignment of error, the Defendants argue that the trial court erred in failing to allow the Defendants to introduce the Updegraff affidavit into evidence and adduce testimony regarding the settlement referred to by Mr. Johnson in his cross-examination of Mr. Updegraff. Defendants urge that the trial court's failure to allow them to introduce the affidavit into evidence prejudiced them. As stated earlier, Mr. Johnson only used the information contained in the Updegraff affidavit for impeachment purposes. Because the use of the affidavit was limited, we hold that the trial judge's determination that the affidavit itself should not be admitted into evidence is not in error.

Pam Young Kings' Sworn Descriptive List
In this assignment of error, the Defendants assert that the trial court erred in barring the cross-examination of Ms. King regarding a sworn detailed descriptive list. In this sworn detailed descriptive list, Ms. King had sworn that the value of Gloria Young's claim against the Defendants was worth only $500.00 as per the instructions of her lawyer for tax purposes. In opposition to this assignment, Mr. Johnson argues that Ms. Young could not have testified as to the value of the general damages claim. See Foster v. Trafalgar House Oil & Gas, 603 So.2d 284 (La.App. 2 Cir.1992). In Foster, the fourth circuit noted, "[a]s long ago as 1856, the Louisiana Supreme Court ruled that it is for the jury, and not for a witness, to assess the amount of damages for pain and suffering, and that the testimony of a witness as to his opinion of the amount of such damage is not admissible." Id. at 285, 286, citing Wilcox v. Leake, 11 La. Ann. 178 (La.1856). In addition, Mr. Johnson argues that the value of Ms. King's claim is unrelated to the value of Mr. Johnson's claim. Finally, Mr. Johnson argues that the sworn descriptive list is more prejudicial than probative.
Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence. La.Code Evid. art. 401. The trial court may exclude evidence, even if relevant, if it finds that the evidence's probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. La.Code Evid. art. 403. Such evidence may also be excluded based on the trial court's consideration of undue delay or waste of time. Id. The standard of review used by this court in reviewing evidentiary rulings of a trial court is abuse of discretion. See Hines v. Remington Arms Co., Inc., 630 So.2d 809 (La.App. 3 Cir.1993), reversed on other grounds, 94-455 (La.12/8/94); 648 So.2d 331. Here, the court excluded Ms. King's testimonial evidence regarding the sworn descriptive list she gave for tax purposes. *57 La.Code Evid. art. 403 allows the trial judge to exercise his discretion in excluding evidence because of its undue prejudice. Based on a review of the record, we do not find that the trial judge abused his discretion in not allowing in testimonial evidence regarding the detailed descriptive list made for tax purposes.

V. ALTERATION OF DAMAGES
In addition to the assignments of error discussed above, the Defendants assert that the trial court erred in the following manners:
1. The trial court erred in granting Mr. Johnson's post-judgment motion and in barring the reduction in Mr. Johnson's damages for the 25% fault assessed to him by the jury by applying the provisions of La.Civ.Code art. 2323(C).
2. The jury abused its discretion in awarding excessively high general damages for Mr. Johnson's mental anguish.
3. The trial judge erred in increasing upon his own motion the jury's verdict award of general damages from $588,000.00 to $784,000.00 based upon the assumption that the jury made a pre-verdict reduction for Mr. Johnson's comparative fault.
La.Civ.Code art. 2323(C)
The Defendants assert that the trial court erred in granting Mr. Johnson's post-judgment motion and in barring the reduction of his damages for the 25% fault assessed to him by the jury by applying the provisions of La.Civ.Code art. 2323(C). In support of this motion, the Defendants argue that the trial court erred in the retroactive application of La.Civ.Code art. 2323(C) relying on Keith v. U.S. Fidelity & Guaranty Co., 96-2075 (La.5/9/97); 694 So.2d 180. The Defendants seek to distinguish the instant case from Keith stating that Keith dealt with the retroactive application of La.Civ.Code art. 2323(A) and the mandatory allocation of fault for all parties causing or contributing to the fault.
In Keith, however, the Louisiana Supreme Court did not make such a distinction. Rather the supreme court determined that the legislative amendment made by Act 3 to La.Civ.Code art. 2323 was procedural legislation. Id. In doing so, the court reasoned that the legislature had created the substantive right to allocate fault in 1979, when it introduced comparative fault. See Id. The court distinguished the 1979 amendment making those substantive changes from that of the 1996 amendment. Id. The court found that the new amendment simply delineates a method of enforcing the substantive right to a comparative fault assessment. Id. As the court found that the amendment was procedural, the court held that it could be applied retroactively. Id.
La.Civ.Code art. 2323(C) states:
Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
This article requires that all of the loss be borne by the party that committed the intentional wrong. See Wijngaarde v. Parents of Guy, 97-2064 (La.App. 4 Cir. 9/2/98); 720 So.2d 6, writs denied, 98-3144, 98-3152, 98-3162 (La.2/12/99); 738 So.2d 574-575. The party who committed the intentional tort absorbs the percentage of fault allocated to the negligent plaintiff. See Id. As noted earlier, the evidence indicates that Mr. Loyd committed acts of fraud with respect to the bank customers, particularly Mr. Johnson. Fraud necessarily involves an intentional act. Under the language of La.Civ.Code art. 2323(C), Mr. Johnson's damages may not *58 be reduced for his fault because they were caused "partly as the result of the fault of an intentional tortfeasor."
As La.Civ.Code art. 2323(C) prohibits the reduction of a merely negligent plaintiffs recovery if the plaintiff was the victim of an intentional tort, we find that the trial court did not err in failing to reduce Mr. Johnson's damage award. Accordingly, we find that the trial court did not err in failing to reduce Mr. Johnson's damage award by the jury's finding of fault. Therefore, we find this assignment of error without merit.

General Damages
In this assignment of error, the Defendants urge that the trial court abused its discretion in awarding excessively high general damages for Mr. Johnson's mental anguish. In support of their argument, Defendants cite the testimony of Mr. Woody, Mr. Johnson's expert. Mr. Woody testified, "the [customers] aren't there for the bank's love, they are there for the money." The Defendants assert that while Mr. Johnson may have suffered some worry about the repayment of his debt, the record does not suggest the extent of his sleepless nights. Further, they assert that nothing in the record shows whether those sleepless nights were related to anything other than the general worry and common anxiety present among most borrowers.
General damages are those damages which may not be measured in exact monetary terms. Sallis v. City of Bossier City, 28,483 (La.App. 2 Cir. 9/25/96); 680 So.2d 1333, writs denied, 96-2592, 96-2599 (La.12/13/96), 692 So.2d 376, 1063. They are damages which "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style." Keeth v. State, Department of Pub. Safety and Transp., 618 So.2d 1154, 1160 (La.App. 2 Cir. 1993), writ denied, 619 So.2d 563 (La.1993). The jury, as trier of fact, is given vast discretion in the assessment of damages. La. Civ.Code art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). We will only disturb a damage award where there has been a clear abuse of discretion by the trier of fact. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993). Our role in reviewing general damage awards is not to decide what an appropriate award would be were we deciding the case, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
Our first inquiry when reviewing an award of general damages, is whether the trier of fact abused its discretion in determining the amount of damages. Cone v. National Emer. Serv. Inc., 99-934 (La.10/29/99), 747 So.2d 1085. A comparison of other awards given in other cases is appropriate only after we find an abuse of discretion. Youn, 623 So.2d 1257. Even then, we may resort to prior awards only for the purpose of determining the highest or lowest award which is reasonably within that discretion. Id. Only when an award is beyond what a reasonable trier of fact could assess for the effects of a particular injury to a particular plaintiff under the particular circumstances will we reduce an award. Id. Our primary considerations in assessing damages are the severity and duration of the injured party's pain and suffering. Tobin v. Wal-Mart Stores, Inc., 575 So.2d 946 (La.App. 2 Cir.), writ denied, 580 So.2d 923 (La.1991).
We recognize that a jury, as finder of fact, is entitled to great deference in setting general damages. In this instance, however, we must find that the jury abused its discretion in awarding *59 $588,000.00 to Mr. Johnson in general damages. However, the record does support an award of some general damages. The record shows that Mr. Johnson suffered high blood pressure caused by Mr. Loyd's control of his affairs. The record also shows that Mr. Johnson's dealings with Mr. Loyd caused him to endure many sleepless nights over a ten year period, to lose his self-confidence and self-worth, to be humiliated and suffer the loss of his good reputation in the community, and to "work harder and longer every day to try to work his way out of the hole Loyd had dug." Mr. Johnson testified at trial that he continues to lack the self-confidence he had before Mr. Loyd's intervention into his business affairs.
Because we find that the jury abused its discretion in awarding $588,000.00 in general damages, we must now look at other cases to determine what the highest reasonable award of general damages would be in this case. We first turn to the cases cited by the Defendants, Louisiana Farms v. Louisiana Dept. of Wildlife and Fisheries, 95-845(La.App. 3 Cir. 10/9/96); 685 So.2d 1086, writ denied, 97-507 (La.4/4/97); 692 So.2d 422; and Guillory v. Terra International, Inc., 613 So.2d 1084 (La.App. 3 Cir. 1993), writ denied, 619 So.2d 1063 (La.1993).
In Louisiana Farms, this court upheld an award of $35,000.00 apiece to George and Helen Bartmess in general damages. Louisiana Farms, 685 So.2d 1086. This amount was awarded for the mental anguish each suffered as the result of their alligator and catfish farm's seizure by the Louisiana Department of Wildlife and Fisheries (DWF). Id. The trial court found that the couple had suffered severe mental distress when their farming operation disintegrated after the DWF's seizure of their assets. Id.
In that instance, the trial court made the determination regarding damages after hearing George and Helen's testimony at trial. Id. George testified that the DWF's seizure of his farm had "strained" his relationship with his family. Id. at 1110. He also testified that he had been "real irritable," "short fused," and "difficult to get along with" after the seizure. Id. Finally, George testified that he had even discussed ending his marriage because of the strain of the seizure. Id.
In addition, Helen also testified at trial. Id. Helen testified that the DWF's seizure had affected her relationship with her husband and her children. Id. She said that after the seizure, her relationship with her husband had become "pretty strained." Id. She also testified that her children would not visit her as often as they had prior to the seizure. Id. She testified that her children had told her that their father was "too grouchy." Finally, she testified that the bankruptcy, a consequence of the seizure, had stripped her of her pride. Id.
Although the Defendants argue the facts of this case are closely aligned with the facts of the instant case, we find that the two cases are distinguishable. To begin, although the seizure by the DWF produced severe results, the seizure lasted only for nine months. In the instant case, Mr. Loyd's manipulation of Mr. Johnson's business began in 1975 and lasted until 1988 when Mr. Loyd admitted to his wrong doing. In addition, while the plaintiffs in the Louisiana Farms case suffered some emotional and mental anguish, neither plaintiff suffered from any physical manifestations of their distress. In the instant case, Mr. Johnson testified that he had suffered sleeplessness and high blood pressure as well as the loss of his self esteem and good reputation. Clearly then, the general damages to which Mr. *60 Johnson is entitled must be greater than $35,000.00.
In addition, the Defendants cite Guillory, 613 So.2d 1084. In Guillory, our court held that the trial court did not abuse its discretion in awarding $10,000.00 in general damages to a farmer who proved a financial loss due to an unauthorized garnishment which resulted in his bank freezing his accounts and in a denial of a preapproved crop loan. Id. The trial court had awarded Mr. Guillory general damages, finding that Mr. Guillory had felt despair over his inability to continue farming at the critical stage of his crop production. Id. The trial judge also heard the testimony of Francine Deville, who was living with Mr. Guillory at the time of the garnishment. Id. Ms. Deville testified that Mr. Guillory had suffered from "aggravation, inability to concentrate, and general worry about obtaining money to continue supporting himself, in addition to the worry about his farming operation." Id. at 1093.
Mr. Johnson also cites case law regarding the amount of general damages to which he may be entitled. While Mr. Johnson points to many cases, we find that Ratcliff v. Boydell, 93-362 (La.App. 4 Cir. 4/3/96); 674 So.2d 272 and McHale v. Lake Charles American Press, 390 So.2d 556 (La.App. 3 Cir.1980), cert. denied, 452 U.S. 941, 101 U.S. 3085 (1981) are instructive.
Mr. Johnson points to the case of Ratcliff v. Boydell, 93-362 (La.App. 4 Cir. 4/3/96); 674 So.2d 272. In Ratcliff, the fourth circuit upheld a general damage award of $73,000.00 in favor of a plaintiff in a dispute with her former attorneys. Id. The dispute involved the sum plaintiff was to pay her attorneys for their work on a case involving the wrongful death of her husband. The fourth circuit found that such an award was not excessive in light of the attorneys' abuse of process, fraud, and intentional infliction of emotional distress. Id.
In reviewing the facts of the case, the fourth circuit noted that the attorneys' behavior had been "vindictive, dilatory, and obstreperous ... over the previous six years." Id. at 280. The attorneys in question had filed baseless and frivolous counter attacks in pleadings and motions against the plaintiff, including a seven million dollar defamation law suit against the plaintiff. Id.
The case at hand is similar to the Ratcliff case in that Mr. Loyd, like the attorneys in Ratcliff, caused Mr. Johnson emotional harm through their fraudulent actions. In both instances a relationship of trust existed between the plaintiff and the defendants such that the harm caused by the defendants' conduct was particularly offensive to the plaintiff. The crucial difference between the two cases, however, is that in the instant case, the fraudulent and wrongful conduct by Mr. Loyd occurred for a period of over 13 years. Therefore, we feel that Mr. Johnson is entitled to more than the $73,000.00 awarded in the Ratcliff case.
In McHale, 390 So.2d 556, we upheld an award of $150,000.00 for damages caused to Mr. McHale by the publication of a defamatory statement. Id. The newspaper in which the statement was published had a circulation of 35,000. Id. The court awarded the damages in question because it found that the defamatory publication had "greatly injured McHale's reputation as an attorney and impaired his standing in the community." Id. at 568. The court found that Mr. McHale had been "severely humiliated and embarrassed and ha[d] suffered considerable mental distress." Id. at 569. In addition, the court noted that several doctors, some as professionals and some as friends, had testified regarding the effect of the defamatory publication on *61 Mr. McHale's mental health. Id. Finally, Mr. McHale produced evidence that his mental reaction had caused him to require intermittent medical attention and medication. Id.
In comparing McHale to the instant case, several similarities are apparent. While the cause of Mr. McHale's distress was different, the effects of the distress were similar to those felt by Mr. Johnson. Like Mr. McHale, Mr. Johnson suffered from a loss of reputation in the community, lower self esteem, and diminished self confidence. Additionally, Mr. Johnson suffered physical manifestations of his emotional distress in the form of high blood pressure and many sleepless nights. An important difference between McHale and the instant case is that Mr. Johnson did not seek medical treatment whereas Mr. McHale did; however, we note that McHale was decided in 1980. As a result, we must take into consideration that $150,000.00 in today's dollars has substantially less value than $150,000.00 at that time. Taking all of these factors into consideration, we find that the injuries sustained by both parties were similar, and warrant similar damages.
Based on the facts of the case and an analysis of the law regarding general damages in similar instances, we find that the highest reasonable award the jury could have arrived at is $150,000.00. Accordingly, we reduce the general damages award to that amount.

Improper Additur
Because we have found that the jury abused its discretion in awarding $588,000.00, and we have lowered that award to $150,000.00; we find it unnecessary to address this assignment of error.

IV. INSURANCE COVERAGE
The Defendants urge the following assignments of error with respect to insurance coverage:
1. The trial court erred in entering judgment against the Defendants for any pre 1980 damages.
2. The trial court erred in holding that Mr. Johnson could recover emotional damages under the Defendants' policies, based upon the definition of bodily injury therein.
3. The trial court erred in finding that the bank's primary insurance policies contained an applicable aggregate limit that capped their exposure.

Pre-1980 Damages
The Defendants contend that the trial court erred in entering judgment against the Defendants for any pre-1980 damages. In support of this argument, the Defendants claim that they were at risk for two policies prior to 1980, i.e., from 1974-1977 and from 1977-1980. At trial, the jury found Mr. Johnson 25% at fault. As such, the Defendants argue that they can not be cast in judgment for any pre-1980 damages because contributory negligence stood as a complete bar to recovery prior to 1980. Further, the Defendants argue that comparative negligence is a matter of substantive law and may not be applied retroactively; therefore, the doctrine of contributory negligence controls the present case for any claims prior to 1980.
In response to this assignment, Mr. Johnson argues that the Defendants have raised the issue of contributory negligence for the first time on appeal. Mr. Johnson further states that although the defense was pled in the answer of one insurer, it was not part of the pre-trial order, was not tried as an issue in the case, and has never been briefed, or referenced by defense counsel until now.
The affirmative defense of contributory negligence must be set forth in *62 the answer. See La.Code Civ.P. art. 1005. Contributory negligence on part of a plaintiff may not be relied upon by the defendants to defeat the plaintiff's right to recover, where the answer contained no plea of contributory negligence. Rodriguez v. Albright, 70 So.2d 412 (La.App.Orleans 1954). The requirement in the answer of an affirmative plea of contributory negligence has for its purpose the giving of fair notice of nature of defense, and preventing surprise. Austrum v. City of Baton Rouge, 282 So.2d 434 (La.1973); Louisiana & A. Ry.Co. v. Chicago, R.I. & P.R. Co., 345 So.2d 163 (La.App. 2 Cir.1977); Norman v. City of Shreveport, 141 So.2d 903 (La.App. 2 Cir.1962). The Defendants had the burden of establishing contributory negligence as a defense. See Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co., Inc., 525 So.2d 1157, 1163 (La.App. 3 Cir.), writ denied, 530 So.2d 570 (La. 1988).
A review of the record shows that all but one of the Defendants did not assert the affirmative defense of contributory negligence in their answers to Mr. Johnson's demand. In addition, the trial court made no finding regarding that Defendant's assertion that Mr. Johnson was contributorily negligent at trial. Finding no error in the trial court's analysis, we find that the affirmative defense of contributory negligence was not adequately proven or preserved in the lower court. Accordingly, we find this assignment of error without merit.

Bodily Injury
The Defendants assert that the trial court erred in holding that Mr. Johnson could recover emotional damages under the Defendants' policies, based upon the definition of bodily injury therein. At trial, the Defendants filed pretrial motions for summary judgment, which contended that the policies at issue did not provide coverage for emotional distress damages based on the policy definition of "bodily injury."
In its denial of the post-trial motion regarding this issue, the trial court stated:
The defendants argue that mental anguish damages are not covered by their policies where there is no coverage for underlying financial loss. Plaintiffs have previously collected their respective financial losses in other litigation from another insurance company defendant who had issued directors and officers liability policies to the Bank. By this argument, defendants essentially claim their general liability policies should not provide coverage for emotional damages when the insured has in effect a directors and officers liability policy which covers the financial losses. In the settlement agreement for the financial losses the plaintiffs specifically reserved all their rights against these comprehensive general liability insurers.
There apparently is no Louisiana caselaw on this issue and the defendants have cited one California case, Waller v. Truck Insurance Exchange, Inc., 11 Cal.4th 1, 900 P.2d 619, 44 Cal.Rptr.2d 370 (1995), in support of their position. While Waller, supra, dealt with a claim for emotional damages flowing from a non-covered claim for losses of tangible property, the present case deals with a comprehensive general liability insurance policy which provides coverage for bodily injuries, including mental anguish. These policies contain no stated exclusions that support the defendants' arguments.
The defendants' argument is not persuasive and their claim that these emotional damages are not covered is denied.
After a review of the record regarding this matter, we adopt the trial court's reasons *63 regarding its findings of policy coverage and hold that the trial court did not err in finding that Mr. Johnson could recover emotional damages under the Defendant's policies. Accordingly, we find this assignment of error without merit.[1]

Primary Insurance Policies
In their final assignment of error, the Defendants assert that the trial court erred in finding that the bank's primary insurance policies contained an applicable aggregate limit which capped their exposure. Upon a review of the record we are unable to determine how the trial court made its determination of which damages to award against which insurer. Accordingly, we remand to the trial court for that limited purpose.

DECREE
Considering the foregoing discussion, we affirm the trial court's decision for all matters except its damage award which we reduce to $150,000.00, and we remand this case for further proceedings consistent with this opinion. All costs of appeal are assessed to the Defendants-Appellants.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
WOODARD, J., concurs in the result.
NOTES
[1] We note that this portion of the argument by Fidelity Casualty Co., Commercial Ins. Co., and Phoenix Assurance Co. refers us to another Defendant's brief. While we recognize the Defendants' desire to present as many assignments of error on appeal as arguable under the facts of the case, we expect such assignments to be adequately briefed in the brief asserting such assignment.