LGUIDRY, J.
The State of Louisiana, through the Department of Transportation and Development (the State), appeals a damage award to members of a class who were victims of a devastating flood that occurred in April 1983. Considering the evidence presented, we amend the judgment, and as amended, affirm.
*699 FACTS AND PROCEDURAL HISTORY
On April 6-9,1983, floodwaters damaged several homes and businesses in Tangipa-hoa Parish. On April 6, 1984, Jean Bou-dreaux and “the victims of the flood on April 6, 1983” (“class plaintiffs”) filed a petition for damages against various defendants, including the State, wherein they alleged that the State designed and built the Interstate 12 bridge over the Tangipa-hoa River in such a negligent and improper manner that it disrupted the natural flood plain, causing the rising waters of the river to flood their homes and properties in April 1983. The parties agreed to a bifurcated trial, with the issue of liability being heard on April 26-28, 1999. A judgment on the issue of liability was rendered in favor of the class plaintiffs against the State, and the State appealed. This court affirmed the judgment, and a writ granted by the Louisiana Supreme Court was later dismissed, making that judgment final and conclusive as to the liability of the State. Boudreaux v. State, Department of Transportation and Development, 00-0060 (La.App. 1st Cir.2/16/01), 780 So.2d 1163, writ dismissed, 01-1329 (La.2/26/02), 815 So.2d 7.
In the meantime, the parties proceeded to trial on the issue of damages. The damages trial was held on several dates in the months of February, March, and April 2002, before a special master appointed by the trial court. On November 15, 2002, the special master issued a written report of his findings and recommendations, which were adopted by the trial court in a judgment rendered August 6, 2003. Both parties filed motions for new trial, and following a hearing Ron the motions, the trial court rendered a revised judgment on November 5, 2003. The State suspensively appeals the November 5, 2003 judgment, and the class plaintiffs have answered the appeal.
ASSIGNMENTS OF ERROR
The State contends that the following errors resulted in the trial court improperly awarding damages to the class plaintiffs:

ASSIGNMENT OF ERROR NUMBER 1.

The lower court erred in denying the State’s exception of prescription under La. R.S. 49:112.

ASSIGNMENT OF ERROR NUMBER 2.

The lower court erred in its calculations of the number of claimants in the class and the various parts of the class claim including arithmetic errors, errors of improperly including claims that should have been excluded (e.g., claimant born after flood) and duplicate claims.

ASSIGNMENT OF ERROR NUMBER 3.

The lower court erred in failing to require even minimal levels of competent evidence to support the claims.

ASSIGNMENT OF ERROR NUMBER 4.

The lower court erred in awarding damages to persons who have no legal right of recovery.

ASSIGNMENT OF ERROR NUMBER 5.

The lower court erred in awarding certain damages for loss of homes and personal property.

ASSIGNMENT OF ERROR NUMBER 6.

The lower court erred in awarding certain damages for loss of income.

ASSIGNMENT OF ERROR NUMBER 7.

The lower court erred in awarding damages for diminution of value of the real estate despite the stipulation of counsel and the evidence.

*700
\ ASSIGNMENT OF ERROR NUMBER 8.

The lower court erred in awarding damages for mental anguish, in fixing the quantum of such awards, in not requiring adequate proof, in awarding damages to persons who made no claims, and in awarding damages to persons who legally have no claims.

ASSIGNMENT OF ERROR NUMBER 9.

The lower court awarded damages for certain business losses that were not supported by the record and are contrary to law.
The class plaintiffs answered the appeal seeking an increase in the awards for mental anguish and lost wages.
DISCUSSION
In its first assignment of error, the State contends that the trial court erred in denying the peremptory exception raising the objection of prescription pursuant to La. R.S. 49:112. That statute provides:
No claim or debt against the state shall be allowed by the state auditor or paid by the state treasurer after the lapse of ten years from the happening of the event or of the facts upon which any suit is founded or judgment rendered or of the execution of the contract under which the claim is made. No interruption or suspension whatsoever of this prescription shall be allowed. The provisions of this Section shall not apply to the claims, or the judgment rendered thereon, listed in Section 2 of Act No. 110 of 1946.
The trial court overruled the exception, finding that pursuant to La. R.S. 13:5108, the State was not entitled to file a plea of prescription or preemption barring the suit if the claim was filed within the time fixed by law for such suits against private persons. See Tenorio v. Automotive Casualty Insurance, 04-0393 (La.App. 4th Cir.1/5/05), 893 So.2d 115.
A plain reading of the statute in question reveals that it is not directed at the authority of a court to hear and decide an action filed against the State; rather, the statute is clearly directed to the state auditor and state treasurer, expressly proscribing their authority to allow or pay a claim or debt against the State “after the lapse of ten years from the happening of the event or of the facts upon which | Bany suit is founded or judgment rendered ... under which the claim is made.” See Church Point Wholesale Beverage Co., Inc. v. Tarver, 614 So.2d 697, 707 n. 20 (La.1993). In so observing, we find no error in the trial court’s decision to overrule the exception.
In assignments of error numbers two, three, and four, the State again raises arguments that it urged in a motion to compel filed with this court.[1] In both instances, the State contends that the special *701 master failed to examine and evaluate each individual claim form, and based on this failure, awarded damages to individuals who submitted invalid, incomplete, or multiple claim forms, or who did not request the specified relief granted, such as for mental anguish. Although we find merit in the State’s contention that the trial court erred in the calculation of the total number of individual claimants in the class, based on the Damages Procedure Order agreed to by the parties, we find no error in the special master’s failure to examine and evaluate each of the individual claim forms.
By the plain wording of the Damages Procedure Order, the necessity of the special master to personally examine and evaluate each individual claim form was eliminated. Instead, the agreement (the substance of which is quoted below) allowed the special master to establish a percentage or average amount to award based on evidence presented by 30 randomly selected family representatives and any exceptions presented by either side:
hOn joint motion of the parties, the following agreed to procedure is adopted for the trial and the damages claims:

1. Class Representatives for Common Claims

The Court, using any method in its sole discretion, will select randomly from an alphabetical list provided by counsel for the plaintiff class thirty families who will be the representative families to present claims from their claim forms that are common to the class, including all claims for repairs to immovable property, lost wages, lost and damaged movable properties and other such special and general damages, but excluding property devaluation and business loss claim. At least one member of each family so chosen by plaintiffs shall testify about such damages. Evidence including testimony of such family representatives, experts and exhibits will be presented during the first phase of the trial of damages and will commence February 25-28, March 1 and March 4-8, 2002.

IA. Personal Property Losses and Costs of Repair

[Court] approved claim forms have been filed by each class member. The Court will consider the evidence presented by or on behalf of the family representatives and experts and defenses raised by [the] State to determine a percentage of the amount of claimed damages that may be recovered by all class members who have asserted such claims. The court will decide whether the claim forms from the thirty families are accurate, high, or low, and by what percentage. The average percentage from these thirty families will apply to every claim form in the class. For example, if the court finds that the thirty claimants are on average ten percent high (or low) in their damage estimates that deduction (addition) will apply to all class members.
The parties each reserve the right to present ten (10) additional specific items (not claimants) of claimed damage for review by the Court. This may include specific items of loss asserted by individual class members. The procedure for determining the amount of such damages that may be recovered will be determined on an item by item basis and will not be governed by the procedure set forth in the preceding paragraph.

IB. Lost Wages

From the evidence provided by the class representatives who have claimed lost wages, and the defenses raised by the State, the Court will determine a *702 period of lost work hours and a rate of compensation for those hours to be applied to all class members who have claimed lost wages.
The parties each may present ten (10) additional claims for the Court’s consideration. This may include specific items of loss asserted by individual class members. The procedure for determining the amount of such damages that may be recovered will be determined on a case by case basis and will not be governed by the procedures set forth in the preceding paragraph.
1 r,IC. Psychological Damages
Prom the evidence presented by the class representatives and experts, as set forth in paragraph I, and the defenses raised by the State, the Court will determine the appropriate level or levels of compensation for all class members who have claimed psychological damage and apply the average to the class.
The parties each may present ten (10) additional claims for the Court’s consideration on an individual basis. This may include specific items of loss asserted by individual class members. The procedure for determining the amount of such damages that may be recovered will be determined on a case by case basis and will not be governed by the procedures set forth in the preceding paragraph.

II. Business Interruption Losses

These will be tried as separate items on a date to be assigned. The parties have agreed to meet to discuss these claims in an effort to reduce the number of claims to be tried.

III. Property Devaluation

This will be tried as a separate item. The parties have agreed to meet in an effort to agree upon presentation, definition of classes of property and other appropriate matters.
Thus, according to the pertinent provisions of the Damages Procedure Order, the special master was to award a percentage of the amounts claimed for personal property losses and repair costs to all class members who submitted an individual claim form and an average amount to the class as a whole as mental anguish (psychological) damages, irrespective of whether a claim for mental anguish was made based on the evidence presented by the 30 representative families. There is no language in the agreement implying or indicating that the special master would be required to examine or evaluate each claim form in order to award the aforementioned relief.
For lost wages, the Damages Procedure Order provides that such damages should only be awarded to those individuals requesting or claiming lost wages, but there is no further. proviso requiring the special master to examine the validity or completeness of such claims. Instead, as indicated in the agreement, the onus lay with each party to specify those exceptions that may have been entitled to greater or lesser relief. The State, having failed to fully appreciate the consequences of its |sagreement, now asks this court to undo that agreement. Our courts are not authorized to do that. It is not the province of the courts to relieve a party of a bad bargain, no matter how harsh. Sunrise Construction and Development Corporation v. Coast Waterworks, Inc., 00-0303, p. 7 (La.App. 1st Cir.6/22/01), 806 So.2d 1, 5, writ denied, 01-2577 (La.1/11/02), 807 So.2d 235.
Nevertheless, based on our review of the *703 evidence in the record before us,[2] we find that only a total of 1,286 individual claim forms were submitted. Hence, we will amend the judgment and the corresponding awards to reflect this number. In all other respects, we reject the arguments made by the State in assignments of error numbers two, three, and four.
In its fifth assignment of error, the State avers that the trial court erred in its award relative to the class plaintiffs’ claims for damage to their homes and personal property. By this assignment, the State disputes the valuations given by the class plaintiffs for losses sustained by them. In many instances, the State contends that the class plaintiffs improvidently replaced damaged items rather than attempting to clean or repair the items, such as clothing, appliances, and lawn equipment.
Pursuant to the Damages Procedure Order, the special master was required to:
consider the evidence presented by or on behalf of the family representatives and experts and defenses raised by [the] State to determine a percentage of the amount of claimed damages that may be recovered by all class members who have asserted such claims.... The average percentage from these thirty families will apply to evei'y claim form in the class. (Emphasis added.)
Based on the evidence presented by the thirty representative families, the defenses raised by the State, and the expert testimony, the special master found that the class 13plaintiffs had undervalued their losses by a factor of .75 percent and, accordingly, applied this factor to the sum total of the amounts listed on the claim forms.
At trial, a majority of the representative plaintiffs testified that they did not have the money to pay others to perform the necessary repair work on their homes, and thus, they performed the labor themselves with the assistance of other family members and friends. Some of the representative plaintiffs did try to salvage appliances and furnishings by either having qualified repairmen inspect, clean, and dry out damaged appliances or having friends or relatives with such credentials perform the work for them. Nevertheless, many of those plaintiffs stated that they experienced problems with the repaired items, such as rust and unraveling carpets, so that they ended up replacing the appliances and furnishings sooner than normal due to defects attributable to the flood. Several of the plaintiffs who did not attempt to clean or repair their clothing, furnishings, or appliances testified that they were averse to doing so because the goods were stained and contaminated by sewerage waste.
Moreover, most of the representative plaintiffs presented supplemental lists of lost or damaged items that were not included on their original claim forms at trial. It was expressly noted during the trial that the supplemental lists were not being presented to augment the original claim forms, but were introduced for the purpose of assisting the special master in determining whether the amounts claimed by the class plaintiffs on their original claim forms were, on average, too high, too low, or accurate.
The class plaintiffs also presented expert testimony to support the valuation of their claims for personal property loss and repair. The effect and weight to be given expert testimony is within the *704 broad discretion of the trial judge. Burdette v. Drushell, 01-2494, p. 13 (La.App. 1st Cir.12/20/02), 837 So.2d 54, 65, writ denied, 03-0682 (La.5/16/03), 843 So.2d 1132. Unless the stated reasons of the expert are patently unsound, a determination of the expert’s credibility is a factual issue to be resolved by the trier of fact. Lasyone v. Kansas City Southern Railroad, 00-2628, pp. 11-12 (La.4/3/01), 786 So.2d 682, 692.
The class plaintiffs offered Joseph P. Caulfield, a licensed public adjuster accepted by the special master as an expert, who opined that “the claim forms are grossly understated, and that, in most of these instances, these properties that are involved constituted total loss situations.” As Mr. Caulfield explained, “[wjhat I was asked to do was ... to determine the reasonableness of the claim forms that were submitted, whether they were high or low. And not specifically analyze loss by loss, but to look at the overall picture.” Using insurance actuarial data and a national estimating guide, he calculated a base unit price to rebuild wood frame or brick veneer structures and applied that cost figure across the board to all homes for the representative plaintiffs, except mobile homes. After adjusting the figure for inflation and location costs, he multiplied it by the square footage of each home to get a total replacement cost. Fifty percent of the replacement cost is what he used to calculate the value of the contents lost in each structure. The class plaintiffs also presented the testimony of a local contractor who concurred in the construction cost estimates determined by Mr. Caulfield.
The special master, relying on expert testimony as well as the stipulation of parties in the Damages Procedure Order, awarded damages based on his valuation of the claims of the representative plaintiffs, and not on a claim-by-claim basis. Although we acknowledge that some of the class plaintiffs may receive an excessive award based on this calculation, based on the record before us, we cannot say that the special master erred in his determination. Accordingly, we must reject the State’s contention regarding the award of damages for personal property losses and repairs.
I^The State raises several arguments in disagreement with the award for lost wages in its sixth assignment of error. The trial court awarded 211 claimants the sum of $2,400.00 each based on 20 missed work days at a rate of $15 per hour. The State argues that the trial court erred in its determination as to the average number of work days missed, average hourly income earned, and the number of claimants entitled to receive such damages. Unlike the stipulations relative to personal property losses and mental anguish damages, the Damages Procedure Order provides that “the Court will determine a period of lost work hours and a rate of compensation for those hours to be applied to all class members who have claimed lost wages,” based on evidence provided by the class representatives and the defenses raised by the State. (Emphasis added.) We observe that the Damages Procedure Order did not require that the special master determine an average, but to simply make a determination based on the evidence presented at trial and to award the sum determined to all of the class plaintiffs who made a claim for lost wages.
Based on our review of the testimony and evidence presented by the representative plaintiffs at trial, we cannot say that the trial court erred in the amount awarded. The class plaintiffs, however, allege that the trial court erred in failing to award greater lost wages to Joseph Jones and Richard Morse as two of the *705 wage claim exceptions presented at trial. We agree with the trial court’s award limiting Mr. Jones’s recovery to the same amount awarded to the lost wage claimants in general. Mr. Jones claimed lost wages of $251,954.00 as result of having lost his job and being unable to secure an equal-paying position until several years later.
Mr. Jones alleged that he was terminated from his job as a pipefitter when he failed to go to work for several days after the flood while trying to find a place for hiJiim and his family to live.[3] It was his assertion that but for his having missed work, he would have kept his job making $13.75 an hour; however, on further questioning, Mr. Jones acknowledged that in the mid-to-late 1980s, the construction business had collapsed in Louisiana and several people were laid off, including people who worked at the same company where he had worked in early 1983. Thus, we concur in the trial court’s rejection of Mr. Jones’s wage claim as speculative and limiting him to the general amount awarded for lost wages.
On the other hand, we do find merit in the class plaintiffs’ assertion that the trial court should have awarded Mr. Morse additional lost wages based on the evidence presented. At trial, the class plaintiffs presented the expert medical testimony of doctors Charles R. Genovese, Jr. and M.L.G. Winkler, both accepted by the trial court as experts in internal medicine, and Dr. William D. Gouvier, a clinical psychologist. All three experts agreed and referred to medical studies and articles in support of their opinion that the stress Mr. Morse experienced relative to having to rebuild his home, and the attendant financial pressures stemming there from, more probably than not caused the heart attacks and cardiovascular problems Mr. Morse experienced following the flood.
It was shown that prior to the flood Mr. Morse did not experience any cardiovascular problems, nor did he have a family history of such problems. Mr. Morse experienced his first heart attack in August 1984, a year and a half after the flood, but testified that beginning nine months before his first heart attack, he began experiencing chest pains, which he ignored. Because of the several heart attacks that Mr. Morse experienced following the flood, he was forced to stop working as a pipefitter in 1987, which work he had been performing since 1977,11sand take a less stressful, lesser-paying job working for the Tangipa-hoa Parish Council. The class plaintiffs introduced a report from Dennis A. James, a certified public accountant, calculating the total loss of income Mr. Morse sustained as a result of the cardiovascular problems he experienced following the flood.
A trial court’s award for lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. LaFleur v. Martin, 04-516, p. 8 (La.App. 5th Cir.11/16/04), 890 So.2d 26, 31; Rhodes v. State Through Department of Transportation and Development, 94-1758, p. 19 (La.App. 1st Cir.12/20/96), 684 So.2d 1134, 1147, writ not considered, 97-0242 (La.2/7/97), 688 So.2d 487. Considering the evidence in the record before us, we find that the trial court erred in failing to award Mr. Morse the greater sum of lost wages proven and substantiated at trial. We, therefore, amend the judgment of the *706 trial court to award Mr. Morse the sum of $746,772.79 in lost wages in compensation for his decreased earning capacity following his change in employment.
Next, the State argues that the trial court erred in awarding damages for depreciation in property values. Essentially, the State contends that there is no proof of record that the value of the class plaintiffs’ properties depreciated as a result of the flood. Rather the State urges that the value of the class plaintiffs’ properties was comparable to that of other properties outside of the flood area at the time of trial. At issue in determining whether the class plaintiffs’ established a depreciation in the value of their properties is a joint stipulation, which provided in pertinent part:
Plaintiffs cannot and will not attempt to prove the return frequency of the flooding. As of the trial date, plaintiffs cannot prove that the risk of future flooding, whatever it may be, negatively impacts the value of real estate within the class boundaries.
For a period of three years from the date of the flood (April 6, 7, 8 and 9, 1983), the market value of the real estate within the class boundary suffered a “flood stigma” which, for that period, resulted in \ ua thirty-five percent (35%) reduction in the market value of the property.
Within thirty days the parties will submit into evidence a joint expert report (in lieu of their live trial testimony) from the real estate appraisers regarding the total amounts of land, homes, and values in question.
The joint expert report provided the following information, which was relied on by the trial court in rendering the award for depreciation in property values:
if applicable — the date of valuation being within 30 years of 1983, i.e., no later than 2013, which implies a frequency of flooding of 30 years or less — a 35% “diminution of Market Value” factor would apply. Based on all these assumptions, the “total diminution of Market Value” impacting the flood-affected property is 0.35 x $60,000,000 = $21,000,000.
We do not agree with the State that there is no proof of record that the class plaintiffs’ properties suffered any depreciation in value. The stipulation itself serves to prove that for at least three years following the flood, the properties suffered a 35-percent diminution in value. Further, as established by the joint expert report submitted by the parties, the total market value of all discernable property affected by the flood for a 30-year period following the flood was $60,000,000.00. The joint expert report further established that the 35-percent diminution in market value based on the “flood stigma” associated with the property would still attach to the property during that 30-year period, thus resulting in a $21,000,000 diminution in the total market value of all the class plaintiffs’ properties.
Moreover, there was testimony by some of the representative plaintiffs regarding their difficulty and sometimes inability to sell their property because of the flood, with the exception of Tommy Tucker. As the State points out, Mr. Tucker did testify that he had no difficulty selling his home following the flood; however, he also related that his employer at the time purchased his home from-him as a consequence of his being transferred to another city to work. Whereas, Hazel Lavigne, another of the representative plaintiffs, testified that her home was fylisted for sale with potential buyers at the time the flood occurred. She testified that her family attempted to sell the house for a year following the flood, with no success, so they stopped *707 trying to sell the house until 1996, when they again listed the house for sale at $86,500.00, a little below its appraisal value. They sold the house for $82,000.00.
Where there is a legal right to recovery of damages but the amount cannot be exactly determined, the courts have reasonable discretion to assess them based upon all the facts and circumstances of the particular case. Tudor Chateau Creole Apartments Partnership v. D.A. Exterminating Co., Inc., 96-0951, p. 9 (La.App. 1st Cir.2/14/97), 691 So.2d 1259, 1265. Based on the totality of the evidence in the record before us, we find the evidence to be sufficient to support the trial court’s award for the diminution in the value of the class plaintiffs’ properties.
In assignment of error number eight, the State asserts that the trial court’s determination that all of. the class plaintiffs who submitted claim forms are entitled to mental anguish damages was clearly wrong. An award for mental anguish as a result of damage to property is normally permitted in four instances:
(1) property damaged by an intentional or illegal act; (2) property damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) property damaged by acts constituting a continuous nuisance; and (4) property damaged at a time which the owner thereof is present or situated nearby and the owner experiences trauma as a result.
Keller v. Case, 99-0424, p. 6 (La.App. 1st Cir.3/31/00), 757 So.2d 920, 924, writ denied, 00-1874 (La.9/29/00), 770 So.2d 354.
The property damage suffered by the class plaintiffs did not result from an intentional or illegal act, acts for which the tortfeasor would be held strictly and absolutely liable, or acts constituting a continuous nuisance, but did occur at a time when the owners of the property were present or situated nearby. The State, nevertheless, asserts that not all of the class plaintiffs are entitled to recover mental 1^anguish damages because the evidence shows that not all of the class plaintiffs experienced trauma as a result of the property damage sustained, but instéad only experienced a normal degree of worry and distress that would be associated with having one’s property destroyed or damaged by a flood. See Kemper v. Don Coleman, Jr., Builder, Inc., 31,576, p. 14 (La.App. 2nd Cir.7/29/99), 746 So.2d 11, 21, writs denied, 99-2954, 99-2955 (La.1/7/00), 752 So.2d 861.
We agree that there is evidence indicating that not all of the class plaintiffs who submitted' claim forms experienced “psychic trauma” as a result of the flood damage to their property; we, nonetheless, do not find that the trial court erred in awarding all of the class plaintiffs who submitted claim forms damages for mental anguish. First, we note that physical injury or manifestation of serious mental distress need not be proven in cases in which there is an “especial likelihood of genuine and serious mental distress arising from special circumstances.” Johnson v. First National Bank of Shreveport, 00-870, pp. 21-22 (La.App. 3rd Cir.6/20/01), 792 So.2d 33, 51, writs denied, 01-2770, 01-2783 (La.1/4/02), 805 So.2d 212, 213 (quoting Moresi v. State Through Department of Wildlife & Fisheries, 567 So.2d 1081, 1096 (La.1990)).
Although the plaintiff does not suffer contemporaneous personal injury or property damage, he or she nevertheless may recover for negligently inflicted emotional distress if the defendant’s conduct placed the plaintiff in fear or concern for his or her safety.... [In] Louisiana ... an award is proper when the conduct is directed at the mental anguish victim and the circumstances show *708 an “especial likelihood of genuine and serious mental distress.” Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common.
Johnson, 00-870 at p. 21, 792 So.2d at 51 (quoting Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 5-8 at pp. 124-125 (1996)).
Second, although the Damages Procedure Order states that the Court will determine the appropriate level or levels of compensation for all class members who have claimed psychological damage, the agreement then goes on to instruct 117that the average from that determination is to be applied to the class. Normally, such damages would be recoverable only by those class members who claimed or proved psychological damage; however, the Damages Procedure Order agreed to by the State does not have such a limitation. That is the agreed-upon law as to these parties. Hence, since mental anguish damages are recoverable relative to property damage and the Damages Procedure Order allows for the calculated average to be awarded to all class plaintiffs,[4] we find no error in the trial court’s judgment granting such relief. We likewise reject the arguments of the class plaintiffs regarding the trial court’s failure to award varying levels of mental anguish damages, as opposed to an average, based on this same premise.
As for the amount of the mental anguish award, the trier of fact is given much discretion in the assessment of damages and damage awards will only be disturbed when there has been a clear abuse of that discretion; Williams v. City of Baton Rouge, 98-1981, pp. 11-12 (La.4/13/99), 731 So.2d 240, 249. Based on our review of the testimony, evidence, and jurisprudence regarding claims for mental anguish relative to damage to property, we find that the amount awarded was not a clear abuse of the trial court’s discretion, and accordingly, we reject the arguments of the State and the class plaintiffs relative to the amounts awarded.
In its final assignment of error, the State disputes the trial court’s award of business interruption losses to four businesses. We will address the arguments raised relative to each business separately. First, the State contends that the trial court incorrectly calculated the amount owed to the partnership of Joseph Ebrecht and Taylor Fernandez for the loss incurred when the partnership sold its [ 1scommercial real estate including improvements. It was proven at trial that the real estate sold, a poultry farm comprised of 33 acres of land and six poultry houses, was purchased by the partnership in 1972 for $59,000.00; the partnership later purchased a railroad right-of-way that ran through the property for $515.00, making for a total acquisition cost of $59,515.00. After purchasing the property, the partnership decided to modernize the poultry operation and spent a total of $202,000.00 on improvements. After the flood, the partnership decided to sell the farm in March 1994 for $58,000.00. At trial, an accountant for the partnership testified that the fair market value of the real estate at the time of the flood was $276,515.00.
*709 Generally, three approaches have been followed by the Louisiana courts in arriving at the amount of damages to property: (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged. Corbello v. Iowa Production, 02-0826, pp. 7-8 (La.2/25/03), 850 So.2d 686, 694. Apparently, the trial court, in awarding the partnership $218,515.00, chose to take the difference in the value of the property prior to and following the flood. We find no error in this calculation and reject the State’s arguments in regard to this business.
Next, the State contends that the trial court’s award to Hydes Slaughterhouse was improper because it awarded damages for improvements made to the property following the flood. By this contention, the State refers to the effluent (oxidation) ponds and new cooler (freezer) built by the owners of Hydes Slaughterhouse several years after the flood. However, Bobby Hyde, the controlling owner of the slaughterhouse, testified that following the flood, attempts were made to simply | ^repair the damage done to the meat cooler and the effluent ponds, but after repeated repairs proved unsuccessful, the company had no choice but to replace the cooler and construct new effluent ponds. Mr. Hyde testified that prior to the flood, the discharge processed through the existing effluent ponds were never found to be in violation of any environmental quality standards; however, in the time period following the flood up to the construction of the new effluent ponds, the Louisiana Department of Environmental Quality (DEQ) constantly found the discharge to be in violation of quality standards to the extent that the DEQ eventually required the slaughterhouse to construct new effluent ponds.
Mr. Hyde also testified regarding the circumstances leading up to the eventual replacement of the cooler. As he related:
The water got into that and went into the walls and got under the freezer. And the freezer, then, as it got more and more of it, condensation just started building up in it. And then, when ice, you start getting more, your ice starts, when it starts expanding, it got underneath it.... And it moved the floor, this big cement floor with all the meat in there. It kept moving up to an end. And then, when it moved it up, it started cracking; that made it worse. And then, it just, from then on, it finally destroyed that big freezer, then we had to build another — get another freezer built.
From this testimony, it is clear that the freezer did not just simply stop working because it was old, but water from the flood that seeped into the freezer caused it to stop working. We thus conclude that the trial court did not err in awarding Hydes Slaughterhouse damages for the construction of the effluent ponds and the cooler.
The last two business loss awards that the State objects to are those made to Sandra Kilburn Evans and Edward Cos-grove. At the time of the flood, Mrs. Evans and her now deceased ex-spouse, Danny Kilburn, ran a franchise of the Geodesic Dome Company whereby they constructed and sold dome structures.[5] Mrs. *710 Evans 1^testified that they lost all of their inventory and tools in the flood, and without insurance, they were not financially able to restart the business.
Stephanie Schulte, the daughter of Mrs. Evans and Mr. Kilburn, also testified that her parents decided to open a franchise of the Geodesic Dome Company in Louisiana because the dome structures were supposedly capable of withstanding such severe weather conditions as hurricanes. As she explained, “it was supposed to be the strongest manmade structure known to man, a geodesic dome. It could even stand two hundred and fifty (250) mile an hour winds, but nobody told us we were going to be flooded.” Following the flood, Mrs. Schulte stated that her family’s booming business simply disappeared.
The business loss suffered by Edward Cosgrove was relative to approximately 100 acres of land he had purchased to develop as a subdivision. Mr. Cosgrove testified that he had just completed subdividing part of the land into 34 lots and was preparing to offer them for sale when the flood occurred. Following the flood, Mr. Cosgrove only succeeded in selling three of the 34 subdivided lots at a price less than what he had anticipated. Since the lots were not selling, Mr. Cosgrove testified that he entered into a dation en paiement with the bank that held a mortgage on the property because he could not afford to continue paying for the property.
Based on this evidence, we cannot say that the trial court erred in concluding that the flood adversely affected the business ventures of Mrs. Evans and Mr. Cosgrove and, thus, they were entitled to recover damages for the business losses experienced.
CONCLUSION
Accordingly, based on the foregoing re: view, we hereby amend the judgment of the trial court in the following respects: to provide for a mental anguish award of $41,861,872.00 to be awarded to the class and apportioned equally to the 1,286 | claimants individually in the amount of $32,552.00 and to increase the award of lost wages to Richard Morse to $746,772.79. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal, in the amount of $15,672.50, are to be apportioned equally between the State and the class plaintiffs.
AMENDED, AND AS AMENDED, AFFIRMED; MOTION TO COMPEL DENIED.

. By agreement of the parties, the claim forms were formally introduced into evidence during the trial; but instead of physically being placed in the court's record, the claim forms were kept at the law offices of counsel for the class plaintiffs. After the subject appeal was filed, the State filed a motion with the trial court requesting that counsel for the class plaintiffs be ordered to deliver all proof of claim forms to the clerk of the trial court to be forwarded to this court as part of the record on appeal. The trial court granted the motion ex parte. The class plaintiffs then filed a motion to stay the ruling, arguing that Uniform Rules of the Courts of Appeal, Rule 2-1.12 prohibits litigants from filing bulky or cumbersome documents or exhibits with this court unless ordered to do so by this court. This court granted the motion to stay. Thereafter, the State filed a motion seeking to compel the trial court to supplement the appellate record with the claim forms, which was referred to the merits of this appeal. For the reasons outlined in this opinion, we hereby deny the motion to compel.

. We specifically refer to a spreadsheet submitted into evidence by the plaintiffs on April 23, 2002, and referenced by the special master in his written recommendations to the trial court.

. At the time of the flood, Mr. Jones and his family lived in rental property. Following the flood, Mr. Jones testified that he had begun cleaning and repairing the rental property so that he and his family could move back in when the property owner notified him that he was terminating the lease because the property had flooded.

. This conclusion in interpreting the Psychological Damages provision in the Damages Procedure Order is further supported by comparing this provision to the provision for Lost Wages in the agreement, which expressly states that "the Court will determine a period of lost work hours and a rate of compensation for those' hours to be applied to all class members who have claimed lost wages."

. Mrs. Evans' business loss claim also included a claim for her craft business that she conducted in her home called "Sandy's Arts and Crafts.” In its brief, the State confines *710 its objection to the award for the business loss of the Geodesic franchise only.