JUDE G. GRAVOIS, Judge.
 

 12This is a suit for damages under the Louisiana Securities Law, LSA-R.S. 51:701,
 
 et seq.
 
 Plaintiff, Mary Doucet, sued defendants, First Federal Guaranty
 
 [1]
 
 (“FFG”), Heith R. Huguet, John M. Compton, Jr., David Michael Compton, and Sherel J. Pizzolato, Jr., for damages for breach of fiduciary duty as a result of their involvement in sales to her of unregistered securities that were later determined to be part of a “Ponzi scheme.” Prior to trial, Ms. Doucet settled all claims she had asserted against FFG, the Comptons and Mr. Pizzolato,
 
 [2]
 
 leaving only Mr. Huguet as the remaining defendant at trial. After a one-day bench trial, the trial court found
 
 *480
 
 Mr. Huguet liable to Ms. Doueet for breach of fiduciary duty and awarded her $49,323 in damages, attorney’s fees and expert witness fees, plus judicial interest and costs. Mr. Huguet appeals, arguing first that the trial court erred in denying his motion for involuntary dismissal based upon a release and waiver of | ¡¡claims signed by Ms. Doueet, second that the trial court erred in calculating damages, and third that the trial court erred in awarding damages to Ms. Doueet for mental anguish.
 

 For the following reasons, we affirm the trial court’s ruling denying Mr. Huguet’s motion for involuntary dismissal. Further, we amend the trial court’s $49,323 award to Ms. Doueet for damages, attorney’s fees and expert witness fees to $41,496. Ms. Doueet is further entitled to judicial interest on said amended award from September 16, 2010 until paid, plus taxable court costs through dismissal. As amended, the judgment of the trial court is affirmed.
 

 FACTUAL BACKGROUND
 

 Ms. Doueet is a devout Catholic whose sole financial resources were approximately $120,000 invested in certificates of deposits (“CDs”), most of which funds were inherited from her father, and a few thousand dollars contained in two checking accounts. Leading a life dedicated to devotion and prayer, Ms. Doueet paid her living expenses from the interest she earned from her CDs and the money in her checking accounts. She had no other income of any consequence. Until the time she invested with Mr. Huguet, Ms. Doucet’s investments always consisted of very conservative CDs, which she regularly would renew as they matured.
 

 During 2003, Ms. Doueet read advertisements in
 
 The Times-Picayune
 
 newspaper targeted to CD owners about products offered by FFG that would bring a higher interest rate than CDs (referred to in the advertisements as “CD Type Annuity” and “CD Alternative”). The advertisements were introduced into evidence. Ms. Dou-cet called FFG and scheduled an appointment with Mr. Huguet, whom she did not know prior to that time. At their initial meeting, Ms. Doueet |4explained her financial situation to Mr. Huguet, specifically telling him that the safety of her principal was the most important thing to her; second was income. Ms. Doueet had no experience with investment vehicles other than CDs. At some point, she and Mr. Huguet discussed the Catholic faith which they supposedly shared, which she claims induced her trust in him.
 

 The principals of FFG were Mr. Pizzola-to and the Comptons. Mr. Huguet was employed by FFG. He was licensed in Louisiana to sell insurance. Neither Mr. Huguet nor FFG held licenses to sell securities in the State of Louisiana. This was not disclosed to Ms. Doueet. Mr. Huguet told Ms. Doueet that FFG sold CDs and annuities. He advised Ms. Doueet against investing in the CDs his firm was offering because of his concerns about the security of clients’ personal information over the internet. After discussions with Mr. Hu-guet, Ms. Doueet decided to purchase an annuity with an insurance company though FFG. The annuity had a “free look” period following Ms. Doucet’s receipt of paperwork by mail from the insurance company. After reviewing the information packet she received from the insurance company, Ms. Doueet decided that she did not want to purchase the annuity, and made another appointment with Mr. Huguet to fill out the necessary paperwork to opt out of the annuity purchase.
 

 At some point, Mr. Huguet told Ms. Doueet about another investment his company was offering with Resort Holding
 
 *481
 
 International, S.A.
 
 [3]
 
 (“RHI”), referred to in the documents supplied by Mr. Huguet to Ms. Doucet as a “Universal Lease Program.” This investment offered investors the opportunity to purchase timeshare-type vacation unit leases in various resort properties located in Mexico and Central America. A minimum investment of $5,000 was required to participate in the “Universal Lease Program.”
 

 |fiThe “Universal Lease Program” offered investors three possible options. Option One allowed investors to utilize the unit leases themselves and forego any return on their investment. Option Two allowed investors to handle the unit leases themselves and pay unit management and maintenance fees. Neither of these options offered any type of guaranteed, periodic return on the investment. Under Option Three, investors were required to hire an “independent” third-party management company to manage their unit leases. Option Three provided for a guaranteed, fixed income on the investment. Accordingly, this was the only option conducive to Ms. Doucet’s needs since she depended on periodic income generated by her investments to meet her daily living expenses.
 

 Based on what Mr. Huguet represented to her, by selecting Option Three, Ms. Doucet was eligible to receive a guaranteed annual return of 9% on her investment. Mr. Huguet represented to Ms. Doucet that this investment produced significant returns without subjecting the principal to risk, that RHI was a reliable investment that had a long history of consistently making timely payments, and that Ms. Doucet could get her investment back promptly, without penalty, if she ever needed or wanted a return of her savings. Mr. Huguet also told Ms. Doucet that this investment was safe because the operators and facilities were debt free and that she would be insured against loss. At some point, Mr. Huguet further represented to Ms. Doucet that his father-in-law, co-defendant David Compton, had also invested in RHI. Mr. Huguet never disclosed to Ms. Doucet that FFG received a 12% commission on the sale of RHI investments, the largest commission that it earned on any of the products it sold.
 

 On October 29, 2003, based on these representations made by Mr. Huguet, Ms. Doucet purchased $20,000 worth of RHI unit leases through FFG. Also at Mr. Huguet’s advice and request, Ms. Doucet agreed to cash in several other | ^certificates of deposit over time in order to purchase additional RHI unit leases, incurring early surrender charges that Mr. Huguet promised would be added to her RHI investments without additional cost to her. Eventually, from October 29, 2003 through February 26, 2004, Ms. Doucet invested the entirety of her former CD savings in RHI unit leases, in various increments totaling $120,882.
 

 Instead of the promised guaranteed annual income of 9% on her RHI investments, Ms. Doucet received only sporadic income from her RHI investments, ultimately totaling only $7,848 for the more than two-and-a-half years that she held her RHI investments (amounting to an annual return of approximately 3%, according to Ms. Doucet’s expert). After experiencing concern over the lack of her RHI investments’ performance and the security of her principal, on August 3, 2006 Ms. Doucet entered into a Purchase Agreement with Comercializadora Vaca-cional Panama, S.A. (“CVP”) to sell all of
 
 *482
 
 her RHI unit leases to CVP for $71,400, to be paid to her in quarterly installments, beginning on September 30, 2006 and ending on June 30, 2008. In due course, Ms. Doucet received from CVP the entirety of the $71,400 agreed to in the Purchase Agreement.
 

 FIRST ASSIGNMENT OF ERROR
 

 In his first assignment of error, Mr. Huguet claims that the trial court erred in denying his motion for involuntary dismissal made at the close of Ms. Dou-cet’s case. He argues that in the Purchase Agreement to CVP, Ms. Doucet agreed to a release of RHI and CVP that also amounted to a release or waiver of her claims against him. For the following reasons, we find no merit to this assignment of error.
 

 |7The release in question is contained in the Purchase Agreement between Ms. Doucet and CVP, and states, in pertinent part:
 

 ... Leaseholder [Ms. Doucet] on behalf of himself/herself and his/her heirs, successors, assigns and representatives, hereby irrevocably and forever RELEASES, WAIVES AND FOREVER DISCHARGES any and all claims and counterclaims, together with any and all obligations, liabilities, actions, causes of action and demands whatsoever, whether founded in fact, law or equity, whether known or unknown, that Leaseholder can, shall or may have, now or in the future against RHI and CVP or its respective parents, subsidiaries, affiliates, shareholders, directors, officers, employees, agents, successors, assigns and representatives, for any and all reasons or causes whatsoever related to or in any way connected with the Leases, the Vacation Unit or the transactions contemplated by this Purchase Agreement.
 

 Mr. Huguet argues in brief that he was an agent of RHI and thus was covered by the terms of the release. The trial court, however, found that Mr. Huguet was not an agent of RHI and was not meant to be included in the release, a finding that is fully supported by the record.
 

 There is no evidence in the record that Mr. Huguet was an employee, agent, successor, assign or representative of either RHI or CVP. Mr. Huguet was employed by FFG. He sold only the products that FFG offered. He never met with anyone from RHI nor did he visit any of the RHI properties. He never viewed any financial information, balance sheets, or income statements from RHI. It was his superiors at FFG who learned about RHI at a Canadian insurance meeting and who brought the RHI product into their portfolio. Mr. Huguet never communicated with anyone from RHI. His “due diligence” on behalf of Ms. Doucet consisted solely of asking his principals at FFG about the investment. He conducted no independent research into RHI.
 

 Ms. Doucet’s expert testified that he had seen “no indication that [Mr. Huguet] was an agent of, that he was employed by, that he was a representative of, that he was acting in any way on the direct behalf of [RHI], or its affiliates.” To 1 sthe contrary, the expert testified, un-rebutted, that Mr. Huguet acted as Ms. Doucet’s “investment adviser” in connection with the RHI transactions. As such, it is clear that the release of “agents” and “representatives” of RHI did not include Mr. Huguet.
 

 Further, by its own terms, the release did not cover Mr. Huguet. In analyzing whether a release bars recovery, it must be determined whether the claim at issue was intended to be covered by the release. According to LSA-C.C. art. 3076, “[a] compromise settles only those differences that the parties clearly intend to settle, including the necessary conse
 
 *483
 
 quences of what they express.” A general release will not bar recovery for those aspects of a claim not intended to be settled/covered by the release.
 
 Trahan v. Coca Cola Bottling Co. United, Inc.,
 
 2004-0100, p. 16 (La.3/2/05); 894 So.2d 1096, 1107.
 

 There is nothing in the record to suggest that the parties to the Purchase Agreement contemplated Mr. Huguet as being an “agent” or “representative” of RHI or as being released thereby. To the contrary, Ms. Doucet testified that in entering into the Purchase Agreement, she did not intend to release FFG, Mr. Pizzola-to, the Comptons, or Mr. Huguet. Indeed, Mr. Huguet’s argument in favor of his release resulting from Ms. Doucet’s execution of the Purchase Agreement would apply equally if not more strongly to his employers, as it was they who decided to sell the RHI investments. One of them purportedly even met with RHI officials and viewed one or more of the RHI properties. The Purchase Agreement did not release these other parties, however, given that they later entered into settlement agreements with Ms. Doucet in this suit. It is thus clear that the Purchase Agreement did not intend to release the claims that Ms. Doucet has asserted in this matter against Mr. Huguet.
 

 | ;,Mr. Huguet further claims that he was released as a co-debtor in solido to Ms. Doucet with RHI and CVP under LSA-C.C. arts. 3071 and 2203
 
 [4]
 
 , unless Ms. Dou-cet expressly reserved her rights against him. This argument is also with merit because Mr. Huguet was not a co-debtor in solido to Ms. Doucet with RHI or CVP.
 

 The district court did not abuse its discretion in denying Mr. Huguet’s motion for involuntary dismissal.
 

 SECOND ASSIGNMENT OF ERROR
 

 Mr. Huguet next argues that the trial court improperly calculated the damage award to Ms. Doucet. We agree.
 

 LSA-R.S. 51:714 provides for damages in this case, in pertinent part, as follows:
 

 A. Any person who violates R.S. 51:712(A) shall be liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment as computed in R.S. 51:714(C)(1), less the amount of any income received thereon, together with all taxable court costs and reasonable attorney’s fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security. Damages are the amount which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment as computed in R.S. 51:714(0(2).
 

 In its judgment rendered on September 22, 2010 (which included reasons for judgment), the trial court stated that it calculated its award to Ms. Doucet by first deducting the $71,400 Ms. Doucet received in the CVP sale from Ms. Doucet’s total RHI investments of $120,882, resulting in a net amount due to Ms. Doucet of $49,482. The trial court then stated:
 

 
 *484
 
 |inThe court finds that Ms. Doucet is entitled to the sum of $49,382.00 [sic], plus $4,000.00 for expert fees, plus attorney’s fees at the rate of 38.33% on the sum of $49,482.00, or the sum of $16,459.00, minus $20,518.00, the amount previously paid as attorney’s fees, for a total award
 
 of
 
 $49,323 [sic].
 

 Accordingly,
 

 IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff be awarded the sum of $49323.00, from date of judicial demand, until paid and for all costs of these proceedings, [sic]
 

 Mr. Huguet argues in brief that under LSA-R.S. 51:714, Ms. Doucet is entitled only to recover the amount paid for the security, less any income received thereon, plus taxable court costs and reasonable attorney’s fees. As such, he argues that the amount due Ms. Doucet on her RHI investments is $41,634 (being Ms. Doucet’s initial investment of $120,882, less $7,848 in income payments she received from RHI, and also less the $71,400 she received in CVP sale), plus $15,063.05 in judicial interest calculated from the respective dates of her investment purchases to the date she received her last payment from CVP, plus court costs of $2,127.55, for a total of 58,824.60, less the gross amount of the $70,000 settlement proceeds Ms. Doucet received from the other defendants, resulting in an “over payment” to Ms. Doucet of $11,175.40, which Mr. Hu-guet argues should be considered “reasonable” attorney’s fees to her counsel.
 

 Ms. Doucet contends that Mr. Huguet’s calculation of her damages is incorrect, and that his calculation of judicial interest is flawed. At trial, Ms. Doucet introduced several exhibits prepared by her expert witness that calculated her damages utilizing two different methods, the “rescission” method and the “benefit of the bargain” method. The “rescission” method computes the difference between the value paid for the investment and the value received for the investment when sold, if sold in whole or in part. The “benefit of the bargain” method measures the loss sustained by the party owed the fiduciary duty and the [ nprofit of which he has been deprived if he still owns the investment, in whole or in part. Ms. Doucet argues in brief that the former method calculated her damages at $44,440
 
 [5]
 
 , the latter at $93,252
 
 [6]
 
 . Under both methods, Ms. Dou-cet’s expert applied a portion of the $70,000 settlement proceeds received by Ms. Doucet from the other defendants as a credit towards her damage award.
 
 [7]
 
 On appeal, Ms. Doucet cites her expert’s rescission method of calculation to support the trial court’s award to her.
 

 All things considered, we find that the trial court erred in calculating its award to Ms. Doucet. First, the trial court erred in not subtracting the $7,848 in income Ms. Doucet received from her RHI investments. Next, the trial court erred in not giving Mr. Huguet credit against Ms. Dou-cet’s economic damages for any of the $70,000 settlement proceeds Ms. Doucet received from the other defendants. Fi
 
 *485
 
 nally, the trial court erred in characterizing the $70,000 settlement proceeds as “damages to Ms. Doucet for her loss of interest and mental anguish.”
 

 In order to determine Ms. Doucet’s damages in this case, LSA-R.S. 51:714 requires that we first start with the $120,882 that Ms. Doucet paid for the RHI investments, then subtract the $7,848 in income that she received therefrom, then add $52,072
 
 [8]
 
 in judicial interest,
 
 [9]
 
 then subtract $136,984
 
 [10]
 
 in other amounts received by Ms. Doucet, resulting in a net award to Ms. Doucet of $28,122. Ms. | 12Poucet is further entitled to 33.33% of $28,122, or $9,374, as reasonable attorney’s fees,
 
 [11]
 
 plus $4,000 in expert witness fees,
 
 [12]
 
 for a total amended award to Ms. Doucet of $41,496. Ms. Doucet is further entitled to judicial interest on said amended award from the date of trial, September 16, 2010, until paid,
 
 [13]
 
 plus taxable court costs through dismissal.
 

 Mr. Huguet also argues that the amount of attorney’s fees awarded by the trial court (33.33%) is excessive. The trial court has much discretion in fixing the award of attorney’s fees and this award will not be modified on appeal absent an abuse of discretion. An award for reasonable attorney’s fees may be based upon a contingency fee contract.
 
 Norfleet v. Lifeguard Transp. Service, Inc.,
 
 05-0501 (La.App. 4 Cir. 5/17/06), 934 So.2d 846. At trial, Ms. Doucet presented evidence supporting the reasonableness of amount of attorney’s fees in the contingency fee contract that she executed with her attorneys. We find no abuse of the trial court’s discretion in this regard.
 

 THIRD ASSIGNMENT OF ERROR
 

 Mr. Huguet’s final argument is that the trial court was without authority to characterize Ms. Doucet’s settlement with the other defendants partly as damages for mental anguish. As noted above, we agree.
 

 LSA-R.S. 51:714 does not provide for damages for mental anguish. Ms. Doucet cites
 
 Johnson v. First Nat. Bank of Shreveport,
 
 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, in support of her position that damages for fraud can include an award for mental anguish. However, while the
 
 Johnson
 
 case awarded | isdamages for fraud and breach of fiducia
 
 *486
 
 ry duty, that case did not arise under the Louisiana Securities Law. Furthermore, legislation such as LSA-R.S. 51:714, which is directed to a specific matter, will prevail as an exception to more general statutes, such as LSA-C.C. art. 1994,
 
 et seq.
 
 See
 
 Daniel v. Wal-Mart Stores, Inc.,
 
 36,451 (La.App. 2 Cir. 12/11/02), 833 So.2d 1047, 1050.
 
 [14]
 
 Accordingly, the trial court was without authority to characterize Ms. Dou-cet’s settlement with the other defendants partly as damages for mental anguish.
 

 CONCLUSION
 

 For the reasons stated above, we amend the trial court’s $49,323 award to Ms. Dou-cet for damages, attorney’s fees and expert witness fees to $41,496. Ms. Doucet is further entitled to judicial interest on said amended award from September 16, 2010 until paid, plus taxable court costs through dismissal. As amended, the judgment of the trial court is affirmed.
 

 AFFIRMED AS AMENDED
 

 [1]
 

 . In an Amended Petition for Damages that replaced the original Petition for Damages, Ms. Doucet named JDS-Safe Money Management, a Louisiana Partnership, as a party defendant in place of “First Federal Guaranty,” alleging that JDS-Safe Money Management, a Louisiana Partnership, was doing business as First Federal Guaranty. This defendant will be referred to herein simply as “FFG.”
 

 [2]
 

 . Ms. Doucet settled all of her claims against the Comptons for $45,000 and against Mr. Pizzolato and FFG for $25,000, reserving all claims against Mr. Huguet.
 

 [3]
 

 . This entity is referred to interchangeably throughout the record as "Resort Holding International, S.A.” and "Resort Holdings International, S.A.” It will be referred to herein simply as "RHI”.
 

 [4]
 

 . Although Mr. Huguet cites to Civil Code article 2203 in his brief, this article was in fact vacated by the 1984 amendment and reenactment of Titles III and IV of Book III of the Civil Code (Acts 1984, No. 331, § 1).
 

 [5]
 

 . This figure is apparently based on a document attached to Ms. Doucet’s brief that was not introduced into evidence.
 

 [6]
 

 . Ms. Doucet does not argue in brief that the “benefit of the bargain” method of calculating damages should have been utilized by the trial court in this case rather than the "rescission” method. Accordingly, there is no need to discuss how this figure of $93,252 was derived. It is merely stated here for comparison purposes.
 

 [7]
 

 .Ms. Doucet's expert only gives Mr. Huguet credit for the net amount of the settlement proceeds actually received by Ms. Doucet from the settling defendants (i.e., net of attorney’s fees and costs).
 

 [8]
 

 . Judicial interest was properly calculated by Ms. Doucet's expert from the respective dates of Ms. Doucet’s purchases of the RHI investments through the date of trial, September 16, 2010, with appropriate credits injudicial interest on the income on said investments received by Ms. Doucet.
 

 [9]
 

 . Ms. Doucet contends correctly that under LSA-R.S. 51:714(C), the sale of her RHI holdings to CVP did not constitute full repayment of the principal amount of $120,882 she invested, and accordingly, judicial interest is owed through the date of satisfaction of any judgment in her favor.
 

 [10]
 

 . The amount of this credit is the net amount of $45,177 that Ms. Doucet received from her settlements with the other defendants, plus the $71,400 that Ms. Doucet received from the CVP sale, plus a credit of $20,407 in judicial interest on said amounts from the date of receipt thereof by Ms. Doucet through the date of trial. The amount of this credit was properly established through Ms. Doucet's expert witness’s testimony and exhibits in the record.
 

 [11]
 

 . Although Ms. Doucet's expert's calculations recommended attorney’s fees of "33% Gross Up,” we find, as the trial court did, that a flat 33.33% of the damages awarded to Ms. Doucet for attorney's fees is appropriate.
 

 [12]
 

 . This is the amount of expert witness fees granted to Ms. Doucet by the trial court and is not contested on appeal.
 

 [13]
 

 . Judicial interest has already been calculated and included in the previous calculations herein though the date of trial, September 16, 2010, as noted above.
 

 [14]
 

 . We further find that the investment contract in question was intended solely to gratify Ms. Doucet’s pecuniary interests (the protection of principal and the guarantee of income). Thus, we find that LSA-C.C. art. 1998, which allows the recovery of damages when the object of the contract was intended to gratify a nonpecuniary or intellectual interest, is not applicable herein. (See also Comments to this Article.)